(No. 76086▮

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRANK REDD, Appellant.

*Opinion filed May 23, 1996.—Rehearing denied September 30, 1996.*

4

Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, and Frank Redd, *pro se,* for appellant.

James Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Frank Redd, was convicted of the murder and the rape of Aretha and Leola Bea. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty. The jury further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The judge sentenced defendant to death for the murders and to a term of 60 years' imprisonment for each of the rape convictions. The defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm the judgment of the circuit court.

In 1985, at the close of defendant's first jury trial on the offenses charged here, he was convicted of two counts of murder and two counts of rape and sentenced to death. On direct appeal, this court reversed defendant's conviction and sentence and remanded the cause to the circuit court for a new trial and sentencing hearing. *People v. Redd*, 135 Ill. 2d 252 (1990). On remand, the defendant waived his right to the assistance of counsel and proceeded *pro se* at both the trial and the capital sentencing hearing. Against defendant's wishes, a public defender was assigned to be present in the courtroom as standby counsel throughout both phases of defendant's trial.

Defendant's convictions stem from events that occurred in the early morning hours of March 4, 1984. Evidence at trial revealed that on March 3, 1984, Ruby Bea went shopping and left her three daughters, Aretha, age five, Leola, age three, and Robertrese, age two, in the care of defendant's mother, Earceaner Washington, at Mrs. Washington's apartment. When Ruby returned, defendant and several other acquaintances were present at Mrs. Washington's. Ruby stayed for

awhile and visited. That evening, at Ruby's request, defendant accompanied Ruby and her three children to Ruby's apartment located at the rear of the third floor of 6712 South Halsted in Chicago.

Defendant was with Ruby in her apartment when later that evening all three children went to sleep in one bed, fully clothed. After the children were asleep, Ruby and defendant left the children and went downstairs to the second-floor apartment where defendant's sister, Gloria Stewart, and Ruby's brother-in-law, Leslie Bea, lived. When Ruby went downstairs, she did not lock her apartment door because she knew that the street-level entrance to the building was locked. In Gloria's apartment, everyone sat at the table talking, except defendant, who paced the floor. Defendant left briefly, but soon returned and began pacing again.

After defendant left a second time Ruby looked down the steps to see that the street-level entrance remained locked. She did not see defendant as she looked down the stairs. She assumed he had gone into one of the other apartments in the building because insufficient time had passed for someone to leave the building. Ruby was aware that defendant knew the occupant of the apartment across the hall from Gloria's.

After approximately one hour, defendant returned to Gloria's apartment and went directly to the bathroom. At trial, Leslie Bea testified that when defendant returned the second time he had dark red spots on his shirt and red spots on his hand. Defendant conversed with Gloria and Leslie in the bathroom and then left again.

Ruby remained with Gloria and Leslie, and then later returned to her third-floor apartment. When Ruby entered her apartment, she went to the bedroom. She believed she saw two of her daughters, but not Aretha, sleeping in the bed. As she looked for Aretha, Ruby saw

blood on the kitchen floor by the back door. Ruby ran down to the second floor, seeking Gloria's help to find Aretha. After asking for help, but without finding Aretha, Ruby returned to her apartment. When she went back into the bedroom to check on Leola and Robertrese, Ruby discovered that Leola was dead.

Betty Gray, the occupant of the apartment opposite Ruby's apartment, looked out of her door at about 1:30 a.m. on March 4, 1984, and saw that the door to Ruby's apartment was open. Gray entered Ruby's apartment and heard Ruby crying. Percy Hamilton, another apartment occupant in the same building, was with Ruby. Gray ran back to her own apartment and telephoned the police. She then returned to Ruby's apartment, where she found Robertrese sitting unharmed at the end of the bed. Leola was under the covers, with her mouth open and a garment twisted around her neck. Hamilton moved Leola into the living room and attempted resuscitation. Gray unsuccessfully tried to remove the item from around the child's neck.

Police arrived at Ruby's apartment at approximately 2 a.m. on March 4, 1984. When they entered they saw Leola's body on a small couch. The child was naked from the waist down, had a cloth wrapped around her throat and had blood coming from her vaginal area. In the dining room police found a child's shoe, a pair of panties, a pair of small jeans and blood on a piece of furniture. In the kitchen, the back door was ajar about 12 inches and had a nonworking refrigerator lodged against it. Ruby testified that the door was ordinarily secured shut with nails with the refrigerator pushed against the door. A pane of glass was broken out of the same door and glass was scattered on the kitchen floor.

A police officer walked out the back door, and from the third-floor landing saw Aretha's body lying in the back yard. The child was naked from the waist down

and had a cloth wrapped around her throat. About 10 feet from the body was a pair of panties. Other than the footprints the police officer made when he approached the body, no other footprints were found within a 10-foot radius around the body.

Lydia Booth testified that in March of 1984, she lived next door to defendant's mother's apartment in a building approximately five blocks from where Ruby and her family lived. At approximately 12:30 or 1 a.m. on March 4, 1984, Booth was standing on the landing, near the entrances to her and defendant's mother's apartment. As Booth saw defendant come up the stairs, she noticed he was wearing blue jeans with blood on them. Booth asked defendant what had happened and defendant replied that he had fallen. He then went into his mother's apartment. Defendant left approximately 20 minutes later. He wore a different pair of pants and he carried a bag. Booth asked defendant why he had changed his clothes, but defendant did not answer. Booth then asked defendant if he was going to the lounge where his brother worked. Defendant replied that he was going to the lounge but "he had to make a run first."

Several witnesses, including people from the apartment building, defendant, and his mother, were questioned at police headquarters on the morning of March 4, 1984. When police first interviewed defendant, he admitted he had been with Ruby Bea on March 3, but stated that he went home after partying for awhile.

After their initial interview with defendant at the police station, police went to defendant's mother's home and recovered a jacket, a sweater with a wet front and a pair of undershorts they found hanging in the bathroom with the sweater. The sweater and jacket matched the description of the clothing defendant was seen wearing at the victims' apartment building on the evening of the

offenses. After police recovered the clothing, they gave defendant *Miranda* warnings. Defendant then gave police an account of his activities on the evening of March 3 that differed from his original story, but he continued to deny any involvement in the offenses.

Late in the evening of March 4, police recovered a pair of bloody blue jeans from the dumpster in the alley behind the lounge where defendant's brother worked. Police again advised defendant of his rights, confronted him with the evidence and the witnesses' statements. Defendant denied any involvement, but then stated that he remembered being alone with the three children and that one was dead on the couch, but that was all that he could recall.

At approximately 9:30 p.m. that day, defendant confessed to having had intercourse with the victims and then strangling them. Defendant wrote a statement in his own hand that was witnessed and initialed by two assistant State's Attorneys. Defendant also told police that he wore blue jeans during the offenses, and identified the blue jeans that police recovered from the dumpster as the same pants he wore on the night of the murders.

The autopsy performed on Leola revealed 11 instances of external injury, including a ligature impression and abrasions on the neck, abrasions on the chest, and abrasions on the forehead. An internal exam of Leola revealed she had an extensive laceration or tear of the posterior wall of the vagina extending to the border with the rectum. All injuries were recent, and the doctor who performed the autopsy determined that Leola was alive at the time she sustained the injury to her vaginal wall. The doctor also concluded that the cause of Leola's death was strangulation.

The autopsy of Aretha revealed 22 evidences of external injury, including 14 on the face. The doctor

who performed the autopsy said the injuries were recent in origin, and were consistent with someone punching Aretha in the face. The internal exam revealed that the entrance to Aretha's vagina was bloody, and her hymen was completely obliterated. The doctor stated that these injuries were consistent with her being subjected to intercourse by an adult male while Aretha was alive. The autopsy on Aretha also revealed head trauma, most significantly a hemorrhage and a fractured skull, consistent with her head being struck by a hard object. The doctor concluded that Aretha died as the result of strangulation with injuries to the brain and skull as significant contributing conditions.

Forensic testing on semen found in Leola's vagina revealed that the genetic markers in the semen were consistent with defendant's. No semen was present in Aretha's vagina, but blood was present.

Panties found at the scene and identified as Leola's were stained with semen containing genetic markers consistent with defendant's. Blood samples collected from the kitchen floor were consistent with Aretha's blood.

Forensic testing revealed a semen stain on the inside fly panel of the blue jeans recovered from the dumpster behind the lounge where defendant's brother worked. Diffuse bloodstains on the jeans were consistent with the blood of Leola Bea. Hair samples found in the rear pocket of the jeans were consistent in all morphological characteristics with a hair sample taken from the defendant after he was arrested. In addition, flakes of glass scraped from the jeans were found to have a common origin with samples of glass taken from the rear door window of Ruby's kitchen. Glass fragments taken from the kitchen were marked with human blood consistent with that of Aretha and Leola.

A bloodstain was found on the sleeve of the sweater

recovered from defendant's mother's house, but it was too minute to determine its origin. Clippings from defendant's fingernails tested positive for traces of blood; however, the amount of blood was insufficient to determine the type.

The defendant called only one witness, Howard Anderson, president of the Midwest Association for Sickle Cell Anemia. Defendant apparently called Anderson in an attempt to rebut forensic evidence regarding the characteristics of samples of defendant's blood. However, Anderson's testimony consisted only of his acknowledgement that in response to a letter from defendant, Anderson provided defendant with literature and information regarding certain blood characteristics.

Defendant declined to testify on his own behalf. Before the defense rested, the State and defendant agreed to several stipulations. The State stipulated to the fact that blood had been withdrawn from defendant and that in July 1992 defendant's blood sample was analyzed to determine the presence of certain characteristics and sickle cell anemia. The State also stipulated to the fact that defendant had been strip-searched at the police station.

At the close of evidence, the jury returned a verdict finding defendant guilty of the rape and murder of both Aretha and Leola Bea. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a); Ill. Rev. Stat. 1983, ch. 38, par. 11—1(a). The following day, the matter proceeded to a capital sentencing hearing before the same jury.

At the first stage of the sentencing hearing, the State presented evidence that defendant was over the age of 18 at the time of the offenses charged. The courtroom clerk testified that the previous day's verdict forms reflected defendant's convictions of rape and murder in this case. The jury found defendant eligible for the death penalty on the basis of defendant's convictions for mur-

der of an individual under 12 years of age whose death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)), defendant's convictions for multiple murders (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)), and the murder-in-course-of-felony aggravating factor (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

At the second stage of the sentencing hearing, the doctor who performed the autopsies on Aretha and Leola testified again and described the victims' injuries, their causes of death and his conclusions regarding the extent of pain each victim suffered.

The prosecution also presented evidence of defendant's prior offenses. Iola Warren testified that in 1979 defendant strangled and stabbed her mother and raped Iola. Geraldine Warren testified regarding the same events. Henry Van Tholen testified that defendant stole his car in 1973, and that defendant received a sentence of three years' probation for that offense. Reynard Mc-Cray testified that while he and defendant were both inmates at Pontiac Penitentiary in 1980, defendant forcibly subjected McCray to anal intercourse, threatened to kill him, and stabbed him in the neck with a shank. Mc-Cray acknowledged that he had a lengthy criminal record, and was presently in custody while charges were pending against him for possession of a stolen auto and theft.

The State also presented certified copies of defendant's prior convictions. The evidence established that defendant had previously been convicted of and was sentenced to probation for burglary in 1973, theft in 1974, and sentenced to prison for grand larceny in 1976 and rape and attempted murder in 1979.

The State stipulated to the contents of a medical report from Pontiac Penitentiary. The report stated that the resident (McCray) was examined on August 30, 1980,

and no objective physical evidence of anal rape was observed. The State further stipulated to the contents of an emergency room report regarding Geraldine Warren and offered by the defense. The date of the report was not contained in the record, but the contents essentially did not contradict Geraldine Warren's testimony except that the report stated she did not know her attacker.

Defendant declined to present witnesses in mitigation, but did make a closing argument. At the conclusion of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. In a subsequent hearing, the trial judge sentenced defendant to death for the murders of Leola and Aretha Bea and to a term of 60 years' imprisonment for each of the rape convictions. Defendant seeks review of his convictions and sentence in this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## I. TRIAL ISSUES

### A. Waiver of Right to Counsel

In his first trial on the present charges, defendant was represented by the office of the public defender. In this trial on remand, defendant represented himself at both the guilt and sentencing phases with appointed standby counsel from the public defender's office. The pretrial period in this case extended over three years due largely to the defendant's voluminous motions and his requests for continuances.

In his initial court appearance on remand defendant told the court he did not want the public defender to represent him, but he wished to hire a private attorney. Approximately two weeks later defendant told the court that he was unable to hire a private attorney and filed a motion to proceed *pro se*. The judge admonished defendant of the charges against him and the possible penal-

ties, including the death penalty. When the judge asked defendant whether he had been represented by counsel at his first trial, defendant named the assistant public defenders who had previously represented him. The judge then told defendant he had a right to counsel and a right to appointed counsel if he was indigent. The judge warned defendant that self-representation was unwise. Each time the judge asked defendant if he understood, defendant answered affirmatively. Several times the defendant interjected that he did not want the public defender to represent him and that he or his family would be hiring a lawyer. Defendant repeated his desire to represent himself until he hired an attorney.

The trial judge found that defendant understood the nature of the charges against him, the possible penalties, and his right to counsel. The judge stated that he found that defendant had freely and intelligently waived his right to counsel. The judge noted, however, that defendant was continuing his efforts to hire private counsel.

One month later, defendant's motion for substitution of judge was granted. During the next six months, defendant appeared before several judges, one of whom subsequently left the bench and another judge who was temporarily assigned to the call. Defendant introduced himself as "Frank Redd, *pro se*" to each judge. Both judges questioned defendant about his *pro se* status, and several times defendant told the court that he was representing himself while he attempted to hire an attorney. Defendant was granted numerous continuances at his request.

When defendant's case was permanently assigned to the next judge, she inquired about his *pro se* status. During the discussion, defendant told the judge he was representing himself and was trying to hire a lawyer. In his next court appearance, defendant told the judge he

could not hire an attorney and he told her that he "rejected the public defender." The judge advised defendant against proceeding *pro se* and urged him to accept an appointed attorney as standby counsel. The judge asked defendant about his level of education. She also inquired who the private attorneys were that defendant spoke with and offered to try to have one of them appointed to represent defendant. Defendant refused to divulge the attorneys' names. The trial judge repeatedly advised defendant against representing himself. She also told defendant that if he did not hire a private attorney or allow the public defender to represent him and he proceeded *pro se*, she would appoint standby counsel to advise defendant. She then granted a continuance to allow defendant to make further attempts to secure private counsel.

During the next several months, despite the judge's admonishments against proceeding without an attorney, defendant continually asserted his desire to represent himself. He participated in discovery and filed numerous motions. When the judge stated that she would appoint counsel, defendant cited case law and advised the court that he would consider appointed counsel as only standby counsel.

A few months later, the judge appointed a member of the public defender's office to consult with defendant concerning his case. Defendant agreed to discuss with the assistant public defender the role defendant wished counsel to assume in his case. When defendant next appeared before the judge, the representative of the public defender's office with whom defendant met was also present. The judge articulated the limits of standby counsel's participation. The assistant public defender also addressed the court and stated that he would only function as an advisor and would not actively assist in preparing the defense. Defendant stated several more

times that he did not want a lawyer and that he wanted to represent himself. Defendant indicated that he would need to talk to the assistant public defender again, but the record does not contain any more discussion regarding appointed counsel's role.

Over one year before trial, the judge took a leave of absence. Defendant's case was assigned to another judge, who later became the trial judge. In his first appearance before the trial judge, defendant stated that he was representing himself. The judge inquired if the public defender had been appointed for consultation. The judge also asked if defendant had been advised "in detail about the perils of going *pro se*." The assistant public defender, acting as standby counsel, answered "yes" to both questions.

In subsequent court appearances defendant continued to file and argue numerous motions. The trial judge also asked defendant if he was exercising his right to defend himself, and defendant said yes. The trial judge advised defendant that the State was seeking the death penalty. He also told defendant that he could have an attorney represent him "free of charge," and strongly advised defendant not to represent himself. The judge asked defendant the extent of his education. The judge also noted on the record that he was aware that defendant had previously been through a criminal trial. The judge told defendant that if he chose to represent himself he would be treated as an attorney, without "special privileges." The judge then allowed defendant to consult with standby counsel. After the recess defendant requested that the court appoint counsel to represent him, but he specified that he did not want the public defender appointed. The judge agreed and appointed an attorney from the private bar.

Defendant's case was continued repeatedly to allow appointed counsel to prepare. However, defendant

continued to file *pro se* motions, and eventually asked the court to dismiss his appointed counsel, stating that he only wanted the private attorney to function as standby counsel. The court dismissed the private counsel and then reappointed standby counsel from the public defender's office. Defendant represented himself at trial with the public defender as standby counsel.

Defendant's first allegation of error on appeal is that his waiver of the sixth amendment right to counsel (U.S. Const., amend. VI) was not knowingly and understandingly made, warranting reversal of his convictions and sentence.

As a preliminary matter, we address the State's argument that defendant waived the issue of the validity of his waiver of counsel because it was not raised in the post-trial motions. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Immediately after sentencing, the State Appellate Defender was appointed to represent defendant on appeal. Four days later, appellate counsel filed a notice of appeal. After appellate counsel filed the notice of appeal, defendant filed a *pro se* motion for a new trial. The trial court never ruled on the *pro se* motion. However, one year after the notice of appeal was filed, and while defendant's case was on direct appeal to this court, appellate counsel motioned for a limited remand to the trial court for the purpose of filing and disposing of post-trial motions. We granted the motion and counsel filed a post-trial motion and a post-sentencing motion, both of which the trial court denied after a hearing.

The issue of defendant's waiver of counsel was not contained in defendant's *pro se* motion for a new trial. It was, however, timely raised in the motions appellate counsel filed on remand. Accordingly, the issue is preserved for review.

Defendant argues that his waiver of counsel was not

valid because the trial court failed to adequately assess his ability to understand the choice he was making. Defendant claims that the trial court was obligated to specifically ask defendant his level of education, his prior legal experience, and probe his mental and emotional capacity to represent himself.

In *Faretta v. California*, the Supreme Court held that the sixth amendment right to counsel (U.S. Const., amend. VI) implicitly provides for the right of self-representation in criminal proceedings. *Faretta v. California*, 422 U.S. 806, 821, 45 L. Ed. 2d 562, 574, 95 S. Ct. 2525, 2534 (1975). However, the defendant's waiver of counsel must be voluntarily, knowingly, and understandingly made. See *People v. Baker*, 94 Ill. 2d 129, 136 (1983); *People v. Baker*, 92 Ill. 2d 85, 91 (1982); *People v. Hessenauer*, 45 Ill. 2d 63, 68 (1970). Before a criminal defendant's waiver of counsel will be deemed valid the trial court must determine that defendant has the ability to understand the proceedings, that he knows the significance and consequences of his decision, and that his waiver was not coerced. See *Godinez v. Moran*, 509 U.S. 389, 401 n. 12, 125 L. Ed. 2d 321, 333 n. 12, 113 S. Ct. 2680, 2685 n. 12 (1993). The entire record should be considered in determining whether the waiver was knowingly and understandingly made. *People v. Barker*, 62 Ill. 2d 57, 59 (1975).

We believe that the court sufficiently assessed defendant's ability to understand his waiver of counsel and appropriately found that defendant's waiver of counsel was knowingly and understandingly made. A defendant's background, experience and conduct are all factors to consider when determining if a valid waiver of counsel has been made. *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023 (1938). Two different judges, on separate occasions, specifically asked defendant on the record what level of education

he had achieved. In addition, the court was able to observe defendant's demeanor, appearance, and statements to otherwise evaluate whether defendant had the ability to understand the choice he was making in choosing to proceed *pro se.*

Defendant's experience with the legal system is also readily apparent from the record. In an early pretrial appearance, defendant interrupted the judge's preliminary admonishments and recited Rule 401(a) verbatim. 134 Ill. 2d R. 401(a). When the same judge warned defendant that if he was convicted, he could be eligible for an extended term of imprisonment, defendant informed the court himself that he had a prior Class X offense. The record also indicates that at least two of the judges defendant appeared before were made aware through the discovery process of defendant's previous convictions. Each judge that defendant appeared before was aware that defendant had a previous capital trial in this matter and that he was represented by appointed counsel at that trial. On this record, we conclude that the trial court considered defendant's demonstrated familiarity with the legal system and properly concluded that defendant could understand the significance and consequences of his decision to waive counsel.

Defendant's argument that no initial determination of his mental capacity to knowingly waive counsel was made is also inaccurate. Specifically, the record demonstrates that the judge who initially admonished defendant had adequate opportunity to observe defendant and determine his ability to make a knowing waiver of the right to counsel. Defendant demonstrated a rational understanding of the charges against him and the possible penalties. Moreover, defendant coherently participated in all phases of the pretrial and trial proceedings and responded lucidly to each judge's inquiries. Defendant filed numerous motions, examined witnesses and actively presented a defense.

Defendant further contends that the trial judge erred when he did not specifically question defendant's mental capacity to waive counsel after defendant told the judge that at defendant's first trial his counsel raised the general issue of defendant's sanity.

Three years into the pretrial period in this trial defendant filed a motion for appointment of standby counsel other than the public defender. When discussing the motion for new standby counsel, defendant informed the trial judge that the basis of defendant's dissatisfaction with the public defender was that in his first trial on these charges defendant's appointed counsel from the public defender's office filed a motion on defendant's behalf requesting that defendant be examined to determine his sanity at the time of the offenses, his fitness to stand trial and any mitigating factors as to the death penalty. Defendant contends that the failure of the trial judge in this case to make appropriate inquiries regarding defendant's mental capacity to waive counsel warrants reversal of his convictions and a new trial.

We disagree. Competence to waive counsel is measured by the same standard as competence to stand trial. *People v. Mahaffey*, 166 Ill. 2d 1, 19 (1995), citing *Godinez v. Moran*, 509 U.S. 389, 125 L. Ed. 2d 321, 113 S. Ct. 2680 (1993). In Illinois, a defendant is presumed competent to stand trial. 725 ILCS 5/104—10 (West 1992). The presumption is rebutted by evidence that defendant is unable to understand the nature and purpose of the proceedings against him or assist in his defense. 725 ILCS 5/104—10 (West 1992).

In this case, defendant's conduct demonstrates an ability to understand the proceedings and to assist in his own defense. Our review of the record reveals that defendant's interactions with the court before and during trial did not raise a *bona fide* doubt of his fitness. As

noted previously, defendant vigorously presented his defense. Further, the trial judge stated on the record that defendant "seemed very, very lucid." On this record we believe that the court evaluated defendant's mental capacity to waive counsel and properly granted defendant's motion to proceed *pro se*.

We also reject defendant's allegation that the numerous rambling motions he filed during the three-year pretrial period should have caused the court to question his mental competency to waive counsel. Our review of the record indicates that defendant's motions arguably exhibit a lack of comprehensive knowledge of the law and principles of criminal procedure. Nonetheless, neither the written motions nor the record of defendant's defense of the motions demonstrates irrationality. Defendant's ability to articulate his case and to precisely motion the court are merely measures of his proficiency or lack thereof as a lawyer. His ability to represent himself is not indicative of his competence to choose self-representation. *Godinez*, 509 U.S. at 400, 125 L. Ed. 2d at 333, 113 S. Ct. at 2687. Therefore, defendant's numerous and voluminous motions and his imprecision in expressing himself as an attorney do not demonstrate here that defendant lacked the mental capacity to waive counsel.

Defendant next argues that his waiver of counsel was invalid at sentencing where the trial court failed to readmonish him of his right to counsel after the verdict and before sentencing. This court has repeatedly upheld the "continuing waiver" rule (*People v. Johnson*, 119 Ill. 2d 119, 147 (1987); *People v. Baker*, 92 Ill. 2d 85, 95 (1982)), which provides that absent significantly changed circumstances or a later request for counsel, an intelligently and knowingly made waiver of counsel applies to all phases of trial. *Baker*, 92 Ill. 2d at 95.

Defendant first argues that the court should have

readmonished him prior to sentencing because the admonishments he received regarding waiver of counsel prior to trial were inadequate. As we have stated, we believe the court properly evaluated defendant's ability to make a knowing and understanding waiver of his right to counsel and find that the admonishments given him before accepting defendant's waiver of counsel were sufficient.

Defendant next claims that the mere nature of capital sentencing compels readmonishment of *pro se* capital defendants before sentencing. However, defendant offers no support for his argument. Defendant's brief citation to *Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976), is unpersuasive. In *Woodson*, the Supreme Court held that a North Carolina statute imposing a mandatory death sentence on persons convicted of first degree murder was unconstitutional because it allowed unbridled jury discretion. *Woodson*, 428 U.S. at 305, 49 L. Ed. 2d at 961-62, 96 S. Ct. at 2991-92. In reaching its conclusion, the Court emphasized the qualitative difference of the death penalty from a sentence of imprisonment. *Woodson*, 428 U.S. at 304-05, 49 L. Ed. 2d at 961, 96 S. Ct. at 2991. We agree that the statement in *Woodson* reflects the need for individualized sentencing determinations, but this general distinction does not support defendant's specific argument that all *pro se* capital defendants must be readmonished before sentencing. We have previously upheld the "continuing waiver rule" in capital cases (*People v. Simpson*, 172 Ill. 2d 117 (1996); *People v. Johnson*, 119 Ill. 2d 119 (1987)) and defendant offers no persuasive reason to reexamine these holdings. We also note that defendant was subjected to a capital sentencing hearing in his first trial on these charges and was therefore aware of both the process and his right to counsel at sentencing.

Defendant's next contention is that the issue of defendant's sanity, raised by his appointed counsel in his first trial, coupled with his behavior in this trial were circumstances that should have caused the court to reexamine his capacity to proceed *pro se* at sentencing. We have noted, however, that there is no suggestion in the record that defendant was suffering from any condition that would impair his ability to knowingly and understandingly waive counsel for the purposes of this trial. Defendant's suggestion that his sanity may have been questioned in a previous trial is not a circumstance that would require the court to reexamine defendant's waiver of counsel before sentencing, absent indications of irrationality at the present trial.

Defendant also argues that the lapse of time between the beginning of the trial period in this case and sentencing required that he be readmonished. A lengthy delay between trial phases is one circumstance that would possibly necessitate readmonishment of a *pro se* defendant prior to sentencing. *People v. Baker*, 92 Ill. 2d 85, 93-94 (1982), citing *Davis v. United States*, 226 F.2d 834, 840 (8th Cir. 1955). Here, defendant's pretrial period stretched over three years, largely as a result of defendant's requests for continuances. However, the court's admonitions and efforts to have defendant accept appointed counsel continued until two months before trial. Further, once the trial commenced no delay occurred between the guilt phase and sentencing, which was held the day following the guilty verdict. Defendant's reliance on *Schell v. United States*, 423 F.2d 101 (7th Cir. 1970), is distinguishable because the six-month delay in *Schell* occurred between trial and sentencing, unlike the instant case where sentencing immediately followed defendant's conviction.

We also reject defendant's contention that he should have been readmonished prior to sentencing because

the court's initial admonishment did not literally warn him that the waiver of counsel extended to "all phases of the proceedings." The continuing waiver rule does not rest on the trial court's use of specific language in the initial admonishment. *People v. Johnson*, 119 Ill. 2d 119, 145-46 (1987). Here, the court's admonitions prior to accepting defendant's waiver of counsel included a warning that defendant could face the death penalty. Defendant had also been represented by appointed counsel during the capital sentencing hearing of his first trial on these charges. Defendant cannot now argue that he is not familiar with his right to counsel at sentencing.

## B. Testimony of Ruby Bea

Defendant next claims that he was denied a fair trial because the prosecutor was allowed to elicit from the mother of the two victims remarks that defendant believes were prejudicial. Although this issue was raised in defendant's post-trial motion, he failed to offer a contemporaneous objection at trial and has therefore waived the claim. It is well established that both a trial objection and a written post-trial motion raising an issue are required to preserve for review matters that could have been raised at trial. *People v. Mahaffey*, 166 Ill. 2d 1, 27 (1995).

Although issues not properly preserved may be considered on review under the doctrine of plain error, we do not believe that the plain error doctrine will defeat the waiver here. 134 Ill. 2d R. 615(a). Plain error may be invoked in criminal cases where the evidence was closely balanced or the error was of such magnitude that the accused was denied a fair trial. *People v. Bean*, 137 Ill. 2d 65, 80 (1990). Neither element has been satisfied in the case before us. The evidence of defendant's guilt was overwhelming, including defendant's detailed confession which was corroborated by accounts of events

given by several witnesses. Additionally, substantial physical and circumstantial evidence was presented and uncontradicted at trial.

Nor do we believe the alleged error can be described as substantial. The prosecutor asked Ruby Bea if she had problems since the deaths of her children. Ruby responded that she was diagnosed with post-traumatic syndrome and alcoholism. The prosecutor then asked if these problems were the reason Ruby had difficulty remembering events, and Ruby answered yes. We do not believe this isolated comment from the victims' mother, in response to a query about her memory difficulties, was so substantial as to deprive defendant of a fair trial.

### C. Prosecutorial Remarks

Defendant next claims that numerous remarks made by the prosecutor during the guilt phase of the trial were improper. Defendant believes that the remarks deprived him of a fair trial and warrant reversal of his convictions.

During defendant's *pro se* examination of one of the investigating police officers, defendant probed the witness' knowledge of defendant's interactions with the victims' family on the night of the offenses. The colloquy was confusing, and the prosecutor objected, in an apparent attempt to clarify the time period to which defendant was referring. The following exchange then occurred:

"PROSECUTOR: Objection. Is he talking about before or after he killed the children?

THE COURT: Objection sustained.

DEFENDANT: Object to that statement.

THE COURT: The question posed by the State is stricken and disregarded by you. Go ahead. Move on."

Defendant contends that the prosecutor's remarks inflamed the jury's passion and prejudiced the jury against the defendant, depriving him of a fair trial. We agree that the assistant State's Attorney's remark was

improper. However, the prompt sustaining of an objection by a trial judge is ordinarily sufficient to cure any error in a question or answer before the jury (*People v. Hobley*, 159 Ill. 2d 272, 315 (1994); *People v. Baptist*, 76 Ill. 2d 19, 30 (1979)), and we believe the same is true of the prosecution's remark. The trial judge cured any prejudicial impact the comment may have had on the jury by sustaining the defendant's objection and ordering the comment stricken. *People v. Enis*, 163 Ill. 2d 367, 409 (1994).

Defendant next argues that the prosecution misstated the evidence in his closing remarks when he told the jury that defendant had made a confession to a neighbor of the victims.

At trial, Betty Gray testified that on March 4, 1984, at approximately 1:30 a.m., she was leaving Ruby Bea's apartment after Leola had been discovered dead, but before Aretha's body had been found. Gray was in the hallway when defendant charged up the stairs and asked where the individual was that "killed the kids." Gray, who at that time was aware of only one child's death, asked defendant how he knew what had happened. Defendant did not respond and then left the building. On cross-examination, Gray stated that she did not know whether anyone had informed defendant that something had happened to the children.

In his rebuttal argument at the close of the guilt-innocence phase of trial, the prosecutor referred to this comment as defendant's confession to Betty Gray. The court overruled defendant's objection to the comment. Defendant alleges that the prosecutor mischaracterized defendant's statement to Gray as a confession and thereby improperly limited the jury's consideration that defendant's knowledge of the murders could have come from another source.

We agree with defendant that the prosecutor's de-

scription of defendant's statement to Betty Gray as a confession is inaccurate. A confession is a direct acknowledgment of guilt after the perpetration of an offense, and does not embrace mere statements or declarations of independent fact from which guilt may be inferred. *People v. Stanton*, 16 Ill. 2d 459, 466 (1959). Defendant's comments to Gray did not directly acknowledge his commission of the offenses; therefore, the prosecutor's characterization of the comment was incorrect. However, prosecutors are afforded wide latitude in closing argument and improper remarks will not merit reversal unless they result in substantial prejudice to the accused. *People v. Thompkins*, 121 Ill. 2d 401, 445 (1988). Here, defendant's statement to Gray, coupled with other evidence adduced at trial, allowed the reasonable inference that defendant possessed guilty knowledge of the offenses. This was but one phrase in the prosecution's lengthy closing argument. The jurors had heard Gray's testimony and could weigh the implications of defendant's statement to Gray themselves. Moreover, at the time of the prosecutor's remark, defendant's written statement confessing to the crimes already had been read to the jury. Therefore, we do not believe the prosecutor's mischaracterization of defendant's comment to Gray was so substantial that it prejudiced defendant and deprived him of a fair trial.

In his final group of arguments pertaining to the guilt-innocence phase of trial, defendant complains of a number of comments made by the prosecution in summation and rebuttal. However, we need not consider the merits of defendant's arguments regarding these prosecutorial statements. Although the complained-of closing remarks were raised in counsel's post-trial motion, defendant did not object to any of the challenged remarks at trial, and we therefore consider these issues waived. *Mahaffey*, 166 Ill. 2d 1, 27 (1995).

We also believe that the complained-of remarks do not constitute plain error. As noted, the prosecution presented substantial evidence of defendant's guilt. Moreover, our review of the remarks indicates that none of the comments was of the magnitude that it would have deprived defendant of a fair trial. *People v. Carlson*, 79 Ill. 2d 564, 576-77 (1980).

In his closing argument the prosecutor commented that the jurors should not let defendant's decision to represent himself enter into their verdict. He stated that defendant had a right to represent himself and that the jurors should not feel sorry for defendant if "things didn't go exactly perfectly for him." The prosecutor continued:

> "At any rate, he had each and every right that he had as a defendant. He did not lose any rights whatsoever as a defendant when he chose to represent himself. He retained those rights. In fact he gained rights. He had normal defendant's rights plus all the rights a lawyer had and was able to [*sic*] personally to question witnesses themselves and subpoena each and every witness he may want to and put anybody at all on the witness stand and elicit testimony about anything from anyone as long of course as he followed the Rules of Evidence that is relevant to this case."

We do not agree with defendant's unsupported allegation that the jurors would have understood the preceding comments as diminishing the burden of proof or as suggesting that defendant bore the burden of proving his innocence. The prosecutor was urging the jurors not to allow defendant's *pro se* status to influence their verdict. The prosecutor was explaining that in contrast to defendants who have counsel represent them, defendant had been able to personally call and question witnesses. As we have stated, the evidence was not closely balanced and we do not believe that the prosecutor's brief statement regarding defendant's rights was of such

a magnitude that it prejudiced the jury's deliberation and deprived defendant of a fair trial.

Defendant further claims that the prosecutor erred when he told the jurors that if they found defendant guilty, they would have an opportunity to learn more about the defendant at the next stage of trial. The comment came at the end of the State's summation. The prosecutor stated that if the jury found the defendant guilty, the trial would proceed to the next stage where the jury would have an opportunity to learn more "from both sides." He then stated that if the jury did not find defendant guilty he would "walk out the door."

Construing the comment in context (*People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987)), we find no error. Earlier in the trial, during *voir dire*, the judge had informed the jury that if there was a finding of guilty in this case, a separate hearing would be held to determine if the death penalty should be imposed. The comments challenged here were the prosecutor's final plea to the jurors that they not allow the defendant to "go free." The statement that the jurors would learn more if a guilty verdict was returned simply reminded the jurors that if they returned a guilty verdict, a penalty would be imposed, but a separate proceeding would be held to determine what that penalty would be.

Finally, defendant challenges the prosecutor's statement during his rebuttal statement that "it is not too often the People of the State of Illinois have a case with this much evidence." The prosecutor also stated that the State's burden was "just proof beyond a reasonable doubt." The comment was made after defendant's closing argument where he urged the jury to find that the evidence was insufficient to convict him. The prosecutor's comment was a response to defendant's own comments, and therefore was not error. *People v. Mahaffey*, 128 Ill. 2d 388, 425 (1989).

## II. FAILURE TO APPOINT MITIGATION SPECIALIST

Defendant next alleges that the trial court committed reversible error when it denied defendant's motion for appointment of a mitigation specialist.

Eighteen months before trial, defendant presented a motion to the court titled "Petition For Funds To Be Provided For An Investigator *** Which Would Include, But Not Be Limited To Interviews With Potential Witnesses and Character Witnesses For The Defense." The motion sought court appointment of a specific individual to assist defendant regarding "potential witnesses and character witnesses for the defense." The judge initially denied the motion. The basis for denial was that the public defender was equipped to perform such interviews and it was defendant's choice to decline such assistance. After the initial denial, the prosecutor suggested to the judge that defendant was seeking more than routine investigative services. The judge asked defendant to elaborate, and he responded that he was seeking "character witnesses." The judge asked defendant if he wanted witnesses for the purpose of a sentencing hearing. Defendant answered "in the event." The judge then told defendant that she would defer a ruling on the motion.

Four months later, before any ruling was made on the motion, the judge took a leave of absence and defendant's case was transferred to the trial judge. After 10 more months of pretrial proceedings, the trial judge attempted to set a trial date and gave defendant a deadline to resolve the issue of any outstanding motions. Before the hearing was held to dispose of the motions, the judge and defendant again discussed contacting witnesses. Defendant continued to object to the services of the public defender in any capacity, including to help him locate and subpoena witnesses. The judge nonetheless explained to defendant that although

defendant was representing himself, he could use standby counsel to locate and subpoena witnesses. Defendant did not mention his motion for funds to hire an investigator at that time.

Soon thereafter, a hearing was held to dispose of all of defendant's outstanding motions. Defendant did not reintroduce the request for appointment of an investigator or seek a ruling on the previously filed motion. When the trial judge declared that he had disposed of all of the motions, defendant objected. Defendant then mentioned a motion to dismiss, but still did not call the judge's attention to his request for investigative assistance. Between the date of the hearing during which all motions were to be disposed of and the trial date, defendant was allowed to file additional motions. None of the motions, however, revisited the issue of appointment of an investigator.

On these facts it is not clear that defendant ever requested a mitigation specialist. Defendant admits that his request for an investigator was "broadly written" and that he never defined the purpose of his request other than to facilitate investigation of "character witnesses." Defendant argues that by naming a particular individual who is a mitigation expert in his written request, defendant properly defined the particular expertise he sought. The written motion seeks "to employ the services of David Randall and Associates, Psychosocial and Forensic Consultation [address]." The request does not discuss the functions the expert would perform. The judge queried defendant when he tendered the request but defendant did not expound his reasons for the request.

Because defendant failed to explain to the judge why he sought funds to hire the expert, we believe defendant did not sufficiently advise the court that he was requesting assistance to obtain mitigation evidence.

Further, defendant has waived his claim. A movant has the responsibility to obtain a ruling from the court on his motion to avoid waiver on appeal. *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989). Although defendant appeared before more than one judge, as his own counsel he was burdened with the responsibility to track the motions and to monitor their disposition, which he did not do. The judge to whom defendant initially tendered his request made it clear on the record that she was reserving a ruling on the motion. Subsequently, when the next judge asked defendant if he had other outstanding motions, defendant failed to preserve this issue when he did not call to the attention of the court his outstanding request for appointment of an investigator.

Plain error will also not defeat the waiver. The State presented extensive evidence of a gruesome crime in aggravation. No witnesses testified in mitigation. The State's evidence included expert testimony regarding the extreme pain and suffering of the child victims. For example, the expert witness commented that the pain Leola would have experienced from her vaginal injuries would be "one of the worst kinds of pain you could experience." The State also introduced defendant's lengthy criminal record, including his previous convictions for sexual assault and attempted murder.

We also believe that defendant's lack of funds for a mitigation expert did not result in an unfair sentencing hearing. The mitigation evidence defendant suggests an expert would have presented is purely speculative. Defendant contends that had an expert been appointed, there were several avenues of "potentially fruitful" mitigation which could have been pursued. However, the record contains no evidence of what mitigating evidence defendant would have introduced or might have argued. While defendant argues that his lengthy incarceration generally made contacting witnesses difficult, he does

not explain his failure to present the testimony of his family members, whom he claimed to have spoken with repeatedly about obtaining a private attorney. Moreover, defendant's allegation that a mitigation witness could have investigated his psychiatric background is questionable. Defendant's decision to reject assistance of the public defender was based on his objection to any portrayal of him as a person with psychiatric problems. We find inconsistent defendant's argument that he would have been willing to have anyone present such evidence if it were available. Accordingly, defendant has not demonstrated that even if a mitigation expert had been appointed, there was a reasonable probability that defendant's sentence would have been different. See *People v. Hall*, 157 Ill. 2d 324, 340 (1993).

## III. SENTENCING ISSUES

### A. Pathologist's Testimony

Defendant claims that he was denied a fair sentencing hearing because the court allowed the State to present cumulative and prejudicial testimony of an expert, Dr. Donoghue, in aggravation. Defendant acknowledges that Dr. Donoghue's testimony was relevant, but alleges that it was duplicative of testimony at the guilt phase and was therefore inflammatory and prejudicial. However, we do not reach the merits of this issue. Although defendant raised the issue in his post-trial motion, he did not object to Dr. Donoghue's testimony at sentencing and thereby has waived the issue for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

We also reject defendant's argument that the plain error doctrine will overcome the procedural default. 134 Ill. 2d R. 615(a). As we have already noted, the evidence against defendant in aggravation was overwhelming and uncontroverted. Therefore, we need only examine if the alleged error was of such a magnitude that it

deprived defendant of a fair trial. *People v. Bean*, 137 Ill. 2d 65, 80 (1990).

At the guilt phase of trial, Dr. Donoghue related the number and characteristics of the injuries each victim suffered. At sentencing, Donoghue repeated a description of the injuries of each of the victims. However, Dr. Donoghue's testimony also concerned the degree of pain and suffering of each victim and the time of death relative to the rape and injury of each victim. Our review of the record indicates that the repetitive testimony was contextually appropriate to frame Dr. Donoghue's testimony regarding the victims' pain and time of death.

The nature of the contested evidence here contrasts with that in *People v. Williams*, 161 Ill. 2d 1 (1994), relied on by defendant. In *Williams*, the defendant was deprived of a fair sentencing hearing where the prosecutor was allowed to use an oversized demonstrative aid to unnecessarily memorialize clearly understandable testimony of defendant's criminal history. *Williams*, 161 Ill. 2d at 68. The contested evidence in *Williams* was wholly cumulative, where here the pathologist's testimony during the penalty phase of the proceeding put before the jury evidence of the nature of the crime and the pain suffered by the victims. Accordingly, the trial court did not err in admitting Dr. Donoghue's testimony which was relevant to the nature of the crimes and the harm inflicted on the victims, issues relevant to the sentencing proceeding. *People v. Hobley*, 159 Ill. 2d 272, 317 (1994).

### B. Participation of Standby Counsel

In the aggravation phase of sentencing, Iola Warren testified for the prosecution that in 1979 defendant raped her and strangled and stabbed her mother. Iola's mother, Geraldine Warren, also testified. Before defendant cross-examined Geraldine Warren, he was granted a recess to consult with standby counsel. When the hear-

ing resumed, defendant asked the court to allow standby counsel to examine the witness because defendant did not "want to add to her anxiety, frustration of [sic] me." The prosecutor offered the opinion that he did not think defendant was entitled to have standby counsel examine the witness. The trial judge reminded defendant that he had made a choice to defend himself and therefore would defend himself "all of the way through." The trial judge then denied the request on the basis that standby was not the attorney of record, but was only present in a standby capacity. Defendant proceeded to cross-examine the witness without disruption or outburst.

Defendant contends that the trial judge abused his discretion when he denied defendant's request to allow standby counsel to cross-examine Geraldine Warren. Defendant alleges that his constitutional right to counsel (U.S. Const., amend. VI) was denied when the court first appointed standby counsel and then denied defendant's request to allow standby a more active role.

The right of self-representation does not carry with it a corresponding right to legal assistance; one choosing to represent himself must be prepared to do just that. *People v. Gibson*, 136 Ill. 2d 362, 383 (1990). However, the trial court has broad discretion to appoint counsel for advisory or other limited purposes (*People v. Allen*, 37 Ill. 2d 167, 172 (1967)) and to determine the nature and extent of standby counsel's involvement (see *People v. Smith*, 249 Ill. App. 3d 460, 470-71 (1993)). Even where a trial court appoints standby counsel, the constitutional right to self-representation does not require a court to permit a "hybrid" representation in which a defendant alternates between representing himself and having counsel represent him. *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992), citing *McKaskle v. Wiggins*, 465 U.S. 168, 183, 79 L. Ed. 2d 122, 136, 104 S. Ct. 944, 953 (1984); *People v. Taggart*, 233 Ill. App. 3d 530, 557 (1992).

We cannot say here that the trial court's refusal to allow standby counsel to cross-examine a witness was an abuse of discretion. In the pretrial phase, defendant adamantly resisted the court's repeated offers of appointed counsel. Defendant strongly resisted the appointment of standby counsel and ultimately accepted standby counsel only after the trial judge explained that standby counsel's role would be strictly limited. Moreover, the trial judge repeatedly informed defendant that the scope of standby counsel's participation would be very narrow and that if defendant chose self-representation, he would be bound by that decision throughout the trial. Defendant represented himself throughout the guilt phase and the eligibility hearing without seeking the active participation of standby counsel. The trial judge reasonably exercised its discretion in limiting standby counsel's participation to an advisory role.

*People v. Lindsey*, 17 Ill. App. 3d 137 (1974), on which defendant relies, is distinguishable. In *Lindsey*, the trial court allowed defendant to act as his own counsel with appointed counsel in a "co-counsel" role. The court stated that defendant would be proceeding *pro se* with counsel to "assist him." Counsel participated and objected during the examination of the State's first two witnesses. Later, the trial court refused to allow counsel to question several witnesses or to make objections. The appellate court held that it was an abuse of discretion to initially allow counsel to actively participate and then later restrict the availability of counsel to assist the defendant. *Lindsey*, 17 Ill. App. 3d at 143-44.

In this case, the trial judge and the other pretrial judges consistently warned defendant that standby counsel's role would be very limited. Defendant was never led to believe that standby would be allowed to actively participate at trial. Unlike the defendant in

*Lindsey,* here defendant cannot say that he reasonably held an expectation that standby counsel would be available to make objections or examine witnesses.

We do not agree with defendant that because his request was "reasonable under the circumstances" it should have been granted. Defendant fails to demonstrate any change in circumstances that necessitated a change in the level of standby counsel's participation. The record does not reflect that examination of Geraldine Warren posed any more difficulty than cross-examination of other witnesses, including Ruby Bea, the mother of the victims, Iola Warren, a victim of defendant's prior crime, or Reynard McCray, an inmate allegedly raped by defendant.

Even if we accepted defendant's contention that the court's refusal to acquiesce in defendant's desire for a hybrid representation violated his right to counsel, we believe that it was harmless error beyond a reasonable doubt. Defendant's characterization of Geraldine Warren's testimony as a "linchpin" of the prosecution's case in aggravation is unfounded. In the event that Geraldine Warren's testimony had been impeached, substantial evidence of the rape of Iola and the stabbing of Geraldine would nonetheless be before the jury. Iola gave a detailed description of the crimes, and the State later offered a certified copy of defendant's conviction for the rape of Iola Warren and the attempted murder of Geraldine Warren.

We note that after the court denied defendant's request to have counsel question the witness, defendant cross-examined Geraldine Warren. The record does not reflect any overt antagonism that infected defendant's ability to elicit answers to his questions. Defendant explored inconsistencies between Geraldine's testimony and a hospital report. Defendant's contention that the witness was upset and that a different result "probably"

would have obtained is purely speculative. On these facts, we cannot say that had standby counsel cross-examined Geraldine Warren the sentencing jury would have reached a different result.

## C. Jury Instruction

At sentencing, the jury was properly instructed that defendant could be sentenced only to natural life imprisonment without parole if the jury did not impose the death sentence. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c); Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (3d ed. 1992) (hereinafter IPI Criminal 3d). After the court gave IPI Criminal 3d No. 7C.05, the court then instructed the jury on issues in aggravation and mitigation. The final paragraph of the instruction told the jurors that if they did not find mitigating factors sufficient to preclude imposition of the death penalty, then they should sign the verdict requiring the court to "impose a sentence other than death." IPI Criminal 3d No. 7C.06.

Defendant contends that the language of IPI Criminal 3d No. 7C.06, coupled with that of IPI Criminal 3d No. 7C.05, created confusion and allowed the jury to believe that defendant was eligible to receive a prison term of years and that he could be paroled. Defendant argues that he is entitled to a new sentencing hearing because the contradictory instructions deprived him of a fair hearing.

Defendant has waived this issue because he neither objected to the challenged instruction at trial nor offered an alternative instruction. It is well established that a defendant generally cannot challenge an instruction on appeal unless he made a contemporaneous objection at trial and, where appropriate, tendered an alternative instruction. *People v. Rissley*, 165 Ill. 2d 364, 406 (1995).

Under an exception to the waiver rule, substantial

defects in instructions are not waived by failure to make timely objections thereto, if the interest of justice so requires. 134 Ill. 2d R. 451(c). The plain error rule applies when the evidence is closely balanced or when the error is of such a magnitude that it deprives the defendant of a fair trial. *Carlson*, 79 Ill. 2d at 576-77. As previously noted, the evidence against defendant in aggravation was substantial and defendant offered no evidence in mitigation. We need only consider if the alleged error in instructions deprived defendant of a fair trial.

In *People v. Gacho*, 122 Ill. 2d 221 (1988), this court held that where a defendant has been found guilty of multiple murder, it is an incomplete statement of the law to instruct the jurors that if they find sufficient mitigating factors to preclude imposition of the death penalty, "the court shall sentence the defendant to imprisonment." *Gacho*, 122 Ill. 2d at 262; Illinois Pattern Jury Instructions, Criminal, No. 7A.15 (2d ed. 1981) (hereinafter IPI Criminal 2d). This court found that such an incomplete statement of sentencing alternatives could lead the jury to erroneously believe the only way of keeping the defendant from society would be to impose the death penalty. *Gacho*, 122 Ill. 2d at 262.

Following this court's opinion in *Gacho*, trial courts must specifically instruct the jurors in cases involving a defendant convicted of multiple murders that if "they find mitigating factors sufficient to preclude imposition of the death penalty, defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released except through executive clemency." *Gacho*, 122 Ill. 2d at 262.

As defendant points out, IPI Criminal 2d No. 7C.06 was formulated before this court's decision in *Gacho*. Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (2d ed. Supp. 1987). When IPI Criminal 2d No. 7C.06 was

later revised, it did not include language applicable to sentencing a defendant convicted of multiple murder. Defendant argues that the unrevised language of IPI Criminal 3d No. 7C.06 conflicts with IPI Criminal 3d No. 7C.05 and cancels the effectiveness of the *Gacho* instruction which was given in this case.

We disagree. Standing alone IPI Criminal 3d No. 7C.06 could lead the jury to incorrectly believe that defendant could be sentenced to a term of imprisonment which could lead to parole. However, when the complained-of instruction is reviewed in context (*People v. Terry*, 99 Ill. 2d 508, 516 (1984)) with IPI Criminal 3d No. 7C.05, it is clear that only two alternatives existed for defendant's sentence: (1) the death penalty or (2) natural life imprisonment. The complained-of instruction, IPI Criminal 3d No. 7C.06, told the jurors that based on their weighing of aggravation and mitigation factors, the court would either impose the death sentence or a sentence "other than death." That instruction, coupled with IPI Criminal 3d No. 7C.05, also given in this case, correctly instructs the jury that the "other than death" sentence will be natural life imprisonment without the possibility of parole or release except through executive clemency. Unlike *Gacho*, where the jury was given incomplete information regarding the range of sentencing alternatives the defendant might receive, the jury here was given the precise sentencing alternatives statutorily available.

Further, the instruction regarding the verdict forms, given shortly after the complained-of instruction, and the verdict form itself, accurately stated that if the jury found sufficient mitigating evidence "the court shall impose the sentence of natural life imprisonment."

Because IPI Criminal 3d No. 7C.05 and the verdict forms explain the sentence other than death referred to in IPI Criminal 3d No. 7C.06, we believe the jurors were

correctly instructed regarding the sentencing alternatives. Because we find the jury instructions were not improper, we need not analyze the issue under the waiver exception.

Defendant further contends that a prosecutorial remark in closing and a jury instruction given at the eligibility phase exacerbated the alleged confusion created by the instructions. Defendant has waived consideration of these issues for failure to object at trial. *Rissley*, 165 Ill. 2d at 406.

### D. Prosecutorial Comments at Sentencing

Defendant next argues that the prosecutor's comment in his closing argument at the aggravation and mitigation phase of sentencing was inaccurate and improper.

In his closing remarks to the jury in the aggravation and mitigation phase of the sentencing hearing, the prosecutor discussed defendant's criminal history. At the conclusion of his recitation of defendant's previous convictions, the prosecutor urged the jury to sentence defendant to death. The prosecutor told the jury that the time to impose the death penalty was "long, long overdue" for defendant. Defendant did not object to the comment during the sentencing hearing, and therefore he has waived the point. *People v. Fields*, 135 Ill. 2d 18, 55 (1990).

Plain error will not defeat the procedural bar because, as noted previously, the evidence in aggravation was uncontroverted and not closely balanced. Moreover, we do not believe error occurred. We reject defendant's contention that the challenged remark served only to inflame the jury. Prosecutors are afforded wide latitude in closing argument (*People v. Thompkins*, 121 Ill. 2d 401, 445 (1988)), and we believe the State's argument that the jury could have understood the remark to refer to the nine-year lapse between the crime and the sentencing proceeding.

## IV. CUMULATIVE ERROR

Defendant next contends that the cumulative effect of the alleged errors at sentencing denied him a fair hearing and warrants reversal of his death sentence. Having found no errors, we reject defendant's contention.

## V. CONSTITUTIONALITY OF DEATH PENALTY CLAIMS

Defendant's final allegations of error challenge the constitutionality of certain provisions of the Illinois death penalty statute, section 9—1 of the Criminal Code of 1961.

Defendant first claims that his death sentence must be vacated and remanded for a new hearing because it was based in part on an unconstitutional provision of our Criminal Code, section 9—1(b)(7) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)). Defendant contends that the terms used in the statute to define the conduct that will sustain a finding of eligibility, "exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)), are facially vague and therefore unconstitutional.

Relying on the Supreme Court's decisions in *Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988), and *Shell v. Mississippi*, 498 U.S. 1, 112 L. Ed. 2d 1, 111 S. Ct. 313 (1990), defendant alleges section 9—1(b)(7) fails to provide principled guidance for the sentencer's discretion in imposing the death penalty. However, this court has previously considered the constitutionality of section 9—1(b)(7) in light of *Maynard* and has held that section 9—1(b)(7) does not suffer from the same constitutional infirmity as the statute in *Maynard. People v. Odle*, 128 Ill. 2d 111, 138-41 (1988).

We also find defendant's reliance on *Shell v. Mississippi*, 498 U.S. 1, 112 L. Ed. 2d 1, 111 S. Ct. 313 (1990), unpersuasive. In *Shell*, the Supreme Court found the

trial court's limiting instruction, defining an aggravating factor identical to that in *Maynard*, to be constitutionally insufficient. *Shell*, 498 U.S. at 4, 112 L. Ed. 2d at 5, 111 S. Ct. at 314. This court's decision in *Odle*, holding that section 9—1(b)(7) was not unconstitutionally vague, rested on the distinction between the language of the aggravating factor in the Oklahoma statute at issue in *Maynard* and the more specific description which qualifies an accused for the death penalty in Illinois. *Odle*, 128 Ill. 2d at 140. The language of the aggravating factor in the Mississippi statute at issue in *Shell* is identical to the statutory language challenged in *Maynard*, and therefore section 9—1(b)(7) is distinguishable on the same basis.

This court has repeatedly affirmed its holding in *Odle* that the statutory language of section 9—1(b)(7) sufficiently channels the discretion of the sentencer. *People v. Banks*, 161 Ill. 2d 119, 146-47 (1994); *People v. Lucas*, 132 Ill. 2d 399, 443-46 (1989); *People v. Kidd*, 129 Ill. 2d 432, 454-56 (1989). Defendant offers no persuasive ground to support his request that we reconsider the holding in *Odle*, and we decline to do so.

In a related argument, defendant claims the jury instructions in the eligibility phase of the sentencing hearing did not adequately define the language of section 9—1(b)(7). At sentencing, over defendant's objections the judge instructed the jury on the definition of the words "brutal" and "heinous" as contained in section 9—1(b)(7). IPI Criminal 3d Nos. 7B.07A, 7B.07B. Defendant objected to the instruction because he did not believe the jury needed "to be educated as to what is [*sic*] an aggravating factor." Defendant's argument on appeal, that the instructions were too vague to offer principled guidance to the jury, is inconsistent with his objection at trial. Defendant also failed to submit an alternative instruction. Therefore, we find defendant has waived his argument. *Rissley*, 165 Ill. 2d at 406.

We also believe that plain error analysis will not defeat the waiver. In compliance with this court's holding in *People v. Lucas*, 132 Ill. 2d 399, 448-49 (1989), the judge in this case instructed the jury on the definitions of the statutory terms at the sentencing hearing. Brutal was defined as "grossly ruthless, devoid of mercy or compassion, cruel, and cold-blooded." IPI Criminal 3d No. 7B.07A. Heinous was defined as "hatefully or shockingly evil, grossly bad, enormously, and flagrantly criminal." IPI Criminal 3d No. 7B.07B. The instructions gave a sufficient explanation and an adequate limiting construction and we believe no error occurred.

Defendant next argues that the Illinois death penalty statute violates the eighth and fourteenth amendments because it places a burden of proof on the defendant and precludes meaningful consideration of mitigation. We have previously rejected this claim (*Rissley*, 165 Ill. 2d at 408; *People v. Page*, 155 Ill. 2d 232, 283 (1993); *People v. Mitchell*, 152 Ill. 2d 274, 345-46 (1992)) and do so again here. We have also held that the death sentencing procedure is not unconstitutional where the prosecution is allowed to have both initial and rebuttal arguments at the sentencing hearing. *Page*, 155 Ill. 2d at 282-83.

Finally, defendant claims that various aspects of the Illinois death penalty statute, in combination, invite the risk of arbitrary or capricious imposition of death sentences. Defendant admits that this court has previously examined and rejected the constitutional challenges defendant raises. See *People v. Whitehead*, 116 Ill. 2d 425 (1987); *People v. Albanese*, 102 Ill. 2d 54 (1984); see also *People v. Tenner*, 157 Ill. 2d 341, 390 (1993); *Page*, 155 Ill. 2d at 284-85. Defendant suggests the previously rejected grounds for finding the statute unconstitutional, when considered cumulatively, render the statute unconstitutional. However, this court has held that if the

individual aspects of the statute are constitutional, then it follows that the whole is constitutional. *People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989).

CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, November 12, 1996, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*