2022 IL App (2d) 191011-U
No. 2-19-1011
Order filed January 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1755 |
| ANTHONY POTOCHNEY, | ) ) | Honorable Linda Abrahamson |
| Defendant-Appellant. | ) | Judge, Presiding. |

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

¶ 1    *Held*:  The circuit court's denial of defendant's request to conduct post-plea proceedings *pro se* was not an abuse of discretion and defendant was not prejudiced by the trial court's failure to advise him of the potential of discretionary, consecutive sentences resulting from his guilty plea.

¶ 2    Defendant, Anthony Potochney, entered a partially negotiated plea (with no agreement as to sentencing) to three counts of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(d)(1)(F), 11-501(d)(1)(C) (West 2016) (counts I, V, and VIII) and one count of failure to stop after having a vehicular accident involving personal injury or death (625 ILCS 5/11-401(a) (West 2016)) (count XI). The circuit court of Kane County sentenced defendant to an aggregate 13-year

term. Defendant appeals, arguing that the circuit court erred by: 1) abusing its discretion in failing to allow defendant to represent himself in postplea proceedings; and 2) failing to properly admonish him pursuant to Illinois Supreme Court Rule 402(a) (eff. July 1, 2012). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      We summarize the relevant facts from the record on appeal. On October 7, 2016, defendant was driving southbound on Broadway Street in Aurora, when his vehicle crossed over into oncoming traffic and struck a minivan that held four occupants: T.J., her minor daughter, K.J., and two of K.J.'s minor friends, E.M. and J.M. Defendant was driving 85 miles per hour approximately one second before hitting T.J.'s van, despite the posted speed limit being 35 miles per hour.

¶ 5      After striking the minivan, defendant fled the scene on foot. Medics arrived on scene and transported K.J. to a local hospital, where she was pronounced dead. E.M. and J.M. were also transported to the hospital and were treated for their injuries, which included a bruised lung and a hip fracture.

¶ 6      Defendant was apprehended in the nearby area and taken into custody. He strongly smelled of alcohol and burnt cannabis and exhibited slowed, slurred speech. His eyes were "bloodshot and glossy." A police officer recovered a "Ziploc baggie of a plant-like substance" in defendant's pocket, which was later determined to be cannabis. Defendant was also taken to the hospital, where blood tests confirmed his blood-alcohol level as being .193. Additionally, tests indicated the presence of cannabis metabolites within defendant's blood. While at the hospital, defendant told an officer that "he knew his license was gone[,] that he knew he had one too many drinks to drive[,] that he only drinks; that he doesn't do meth; and that he [was] on Xanax, but it [was pursuant to] a prescription." At a subsequent police interview, defendant admitted drinking "approximately six Coors Lights and four drinks of Captain Morgan" before the accident, as well as having smoked

cannabis.

¶ 7     On December 21, 2016, defendant was charged with nine counts of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(d)(1)(F), 11-501(d)(1)(C) (West 2016)) (counts I-III and V-X), one count of reckless homicide (720 ILCS 5/9-3(a) (West 2016)) (count IV), and three counts of failure to stop after having a vehicular accident involving personal injury or death (625 ILCS 5/11-401(a) (West 2016)) (counts XI-XIII). On January 25, 2017, defendant was arraigned. The circuit court advised defendant that any sentences resulting from a conviction for counts XI, XII, or XIII would need to be served consecutive to any sentences resulting from the remaining counts. However, the court did not mention the possibility of any discretionary consecutive sentences stemming from the remaining counts.

¶ 8     On October 27, 2017, defendant indicated that he wished to enter a partially negotiated plea as to counts I, V, VIII, and XI. In return, the State agreed to dismiss the remaining charges, but the parties did not reach any agreement regarding sentencing. The trial court reviewed the nature of the charges implicated in the deal as well as the possible sentences and fines resulting therefrom. Specifically, the circuit court admonished defendant that count I constituted a Class 2 felony. Additionally, it informed defendant that count I was non-probationable unless the court found "extraordinary circumstances," and subject to a prison term of 3 to 14 years, which would need to be served at 85 percent, to be followed by two years of mandatory supervised release. The court further admonished defendant that counts V and VIII were probationable, Class 4 felonies subject to a prison term of 1 to 12 years, because, as the State pointed out at the time, "special sentencing on those counts [was required] because it's an aggravated DUI." The court further advised defendant that count XI constituted another Class 4 felony, which was probationable, subject to a sentence of 1 to 3 years, which would be followed by an MSR term of one year. The

court advised defendant that any sentence resulting from count XI would have to be served consecutively:

> "If you were in fact imprisoned on Count 11 plus any other count, your time in prison could not be served at the same time on that Count 11, but it would have to come after the time on another count, meaning they couldn't be concurrent, at the same time, but one would follow the other consecutively."

However, the court did not advise defendant of the possibility that any of the other relevant counts were subject to discretionary consecutive sentencing.

¶ 9 Defendant acknowledged his understanding of the court's admonitions, and, after conferring with his defense counsel, Assistant Public Defender Ron Dolak, defendant indicated that he still wished to plead guilty. Defendant further acknowledged that, in lieu of pleading guilty, he had a right to plead not guilty, and to have his choice of either a jury or bench trial. The circuit court told defendant that it wanted "to give [him] all the time [he] need[ed]" to digest this information before entering his plea, before asking defendant if he felt "okay" about the instant proceedings. Defendant responded, "I'm feeling all right, I guess." The court mentioned the possibility of continuing the matter to a later date, but the State indicated that, if defendant did not enter his plea on October 27, 2017, then the State would seek a trial date. The defendant indicated that he was "good," and again expressed his understanding of the court's earlier admonitions. The court further advised defendant:

> "[Y]ou also know that the entry of your plea is without any agreement with the State as to what the recommended sentence would be, so that we're going to put your whole case over for a sentencing hearing. Court services will prepare a report, and we may have evidence and testimony and I will decide what the sentence will be."

The court asked whether defendant needed more time to confer with defense counsel, and defendant responded that he did not, agreeing that defense counsel had "take[n] all the time [he] needed to cover [the] plea forms." Defendant further agreed that he was satisfied with defense counsel's work on his case and denied that anybody had threatened him or promised anything to induce his guilty plea. Defendant indicated that he had signed his plea forms "freely and voluntarily," and that he wanted to enter his pleas. After hearing the State's factual basis for the case, to which defendant stipulated, the trial court accepted defendant's pleas, finding they had been made "freely and voluntarily" and with defendant's "understanding [of] the possible consequences and penalties that [he] could be facing."

¶ 10    On March 29, 2018, defendant's presentence investigation report (PSI) was filed, and the parties appeared for defendant's sentencing hearing. The PSI provided that defendant was first diagnosed with mental health issues when he was in middle school. As a result of those issues, defendant experienced auditory hallucinations, in that he heard people "cursing at him" when they spoke to him. Additionally, he had been hospitalized in the past for "psychiatric reasons" and "anger." In 2005, defendant was prescribed Risperdal—an antipsychotic drug. Defendant had previously found the medication to be "effective," but eventually ceased using Risperdal and continued "hearing 'wicked voices' from age [18] to age [22]." Defendant claimed to deal with [the voices] by praying and trying to ignore them."

¶ 11    The PSI also described how, after being placed in Treatment Alternative Court (TAC), defendant was diagnosed with bipolar disorder, schizophrenia, and attention deficit hyperactivity disorder, before again being "put on" Risperdal and Xanax. Two weeks prior to the incidents leading to his latest arrest, defendant stopped taking his Risperdal once again, until he was jailed for the instant offenses. In February 2018, he stopped using Risperdal indefinitely.

¶ 12    According to the PSI, defendant scored in the " '[b]elow [a]verage' level of cognitive functioning," as indicated by his "limited vocabulary" and "struggle[s] to comprehend the meaning of words." Nonetheless, defendant was "deemed to meet the legal criteria for fit to stand trial" and determined to be "at the [a]verage range of intellectual functioning," despite testing "[b]elow [a]verage" with regards to "word knowledge, reasoning ability[,] and range of general information."

¶ 13    The PSI also discussed defendant's religious fervor; defendant believed that his auditory hallucinations were the result of 'God speaking to [him]' " and that he was able to " 'listen in *** what's going on in hell.' " As detailed by the PSI, when asked about the prospect of any future relationships he may have, defendant responded, " 'I asked God to tell me where to go in the bible, heard a soft voice that told me to go to that place in the bible, Jesus is the word, felt like I was being attacked by the devil, was worried about what to say to the judge and then felt had to ask God for help and he took me to the bible and I rebuked Satan and the worry went away.' "

¶ 14    In sum, the PSI found that defendant's "symptoms are consistent with a diagnosis of Schizoaffective Disorder, Bipolar Type, Multiple Episodes, Currently in Acute Episode." It continued, "this is a persistent and chronic mental illness that requires on-going medication and treatment to assist with stabilization." Regarding defendant's decision to forgo his medication, the PSI opined that defendant "[was] not aware of how his symptoms may increase as a result of his noncompliance with medication."

¶ 15    Turning back to the hearing, the court asked defendant whether he was up to date with his medications. Defendant responded, "Your Honor, to tell you the truth, I believe the medication that I was taking I have—I have been saved in Jesus' name and healed in Jesus' name. So I recently, like a month-and-a-half ago, stopped taking the medication." In light of this, the court asked

defendant whether the lack of medication has "made it harder for [him] to understand what is happening [or] think clearly." Defendant responded:

> "There is a downside—a [*sic*] effect. And then there is a positive effect due to being so—taking it for such a long time.
>
> And I—it seems like sometimes like—that—due to today, recently when I stopped taking it, that medication, you know, it was—"

The court interrupted defendant and asked defense counsel whether he had any concerns of defendant's mental capacity. Defense counsel indicated that he didn't "have a *bona fide* doubt as to [defendant's] fitness at [that] point." Upon further questioning from the court, defendant indicated that he was "thinking okay," and agreed that nothing was "bothering [him] mentally, physically, or emotionally that [made] it hard for [him] to understand what [was] happening."

¶ 16    The parties presented their witnesses in aggravation and mitigation. Of relevance, Lindsey Liddicoatt testified that she was the treatment alternative court program (TAC) coordinator for Kane County Court Services, and that defendant was a participant in TAC as a result of a prior, unrelated conviction for aggravated battery. Liddicoatt further testified as to the treatment that defendant received as part of TAC, which included the prescription of certain medications that he needed to take "as part of the [TAC]." Liddicoatt described how defendant graduated from TAC in May 2016, and how after graduating, defendant was offered the opportunity to continue with certain programs, including "psychiatry[,] *** case management, therapy, group therapy, et cetera." Despite TAC administrators making sure that defendant "had the opportunity to have appointments set up," and despite her recommendation that defendant continue treatment, defendant had told Liddicoatt that he did not wish to receive any more treatment from TAC after his graduation. However, defendant did convey to Liddicoatt that he wished to continue treatment

with an alternative provider in Aurora. Defendant attended at least one meeting with the Aurora provider.

¶ 17 On cross-examination, Liddicoatt testified that defendant was referred to TAC as a result of a "mood disorder not otherwise specified," meaning defendant "wouldn't have met criteria for full-on bipolar/schizophrenia." When asked whether defendant's mental illness was "cured" at the time of his graduation, Liddicoatt responded, "No. But he was at a point where he was stable. And he did not—he no longer needed the services that the court was providing. He would still benefit from the services in the community, though."

¶ 18 After having presented their evidence in aggravation and mitigation,[1] the parties proceeded with their arguments, and defendant made a statement in allocution to the court. The court sentenced defendant to 10 years' incarceration for count I, two years' incarceration for counts V and VIII, and one year for count XI. It further ordered that the sentences for counts V and VIII would be served concurrent to one another, "but consecutive to the time that [defendant must] serve on [c]ount [I]." Additionally, it ordered that the 10-year sentence for count [I] would be served "mandatorily consecutive" to the remaining counts, for an aggregate term of 13 years.[2]

¶ 19 On April 20, 2018, defendant filed his motion to reconsider sentence. On May 3, 2018, the parties appeared for a hearing on the motion. After defendant asked the court to reconsider its sentence in light of defendant's "mental illness," the court denied defendant's motion. On May 10, 2018, defendant filed his amended notice of appeal. On January 28, 2019, this court entered an order remanding the cause so that defense counsel could file a valid Rule 604(d) certificate. The

---

[1] While defendant did tender four letters of mitigation to the court, they were not read into the record or entered into evidence.

[2] Defendant raises no issues on appeal regarding the sentence imposed.

January 28, 2019, order further granted defendant "the opportunity to file a new motion to withdraw [his] guilty plea and/or reconsider the sentence," if such a motion was necessary.

¶ 20    On July 22, 2019, the parties appeared before the circuit court for a status hearing, in which defense counsel told the court that defendant "want[ed] to proceed *pro se*." The court questioned defendant as to his age and schooling. The court also asked defendant whether he had a current mental health diagnosis, and defendant answered, "Um, I have forgotten." Defendant further explained that he had previously spoken with a psychiatrist and was trying to get back on his medication. The court specifically asked whether defendant knew the name of his mental illness, and defendant responded, "I just got—I'm ups and downs, just like everyone else, but I feel I'm handling my problems in a healthy way." However, defendant admitted that he still was not using any medications, because his psychiatrist purportedly found "[that] even in a controlled environment[, he] would not take [his] medication."  Defendant described how he had weaned himself off the medication "due to side effects [he] was having." When asked whether his psychiatrist suggested to him that he should "take some medicine," defendant responded:

> "She believe [*sic*] at this moment in time that the way I speak to her and the way that I'm handling my mental health and—the way I'm handling my mental health is a healthier way than taking more drugs that led to anxiety and stuff like that. Because Risperdal had gave [*sic*] me anxiety, and that's what led me to taking Xanax. Two weeks before the car accident[,] I stopped taking my Risperdal."

Defendant further suggested that, according to a psychiatrist he had conferred with during his incarceration, "praying, [reading the] Bible, eating healthy, working out, [and] talking to positive people and counselors was the healthiest way" to handle his illness. However, defendant acknowledged having asked "somebody" to "take medicine," because he believed "it was going

to help [him] with [his] court issue," as he was having trouble remembering the facts surrounding his guilty plea. Additionally, defendant stated that taking the medicine would make him "look good." The court asked defendant to elaborate why he had previously wanted to take his medicine. Defendant answered:

> "I just told you to—because they—the State and also I've heard from, I think—I believe it was you in the transcripts saying that due to being in a controlled environment, I wouldn't even follow what the [c]ourt has ordered me with taking medication and meet the psychiatrists is saying, but I—well, I don't want—that's farther on."

¶ 21 The court then asked defendant whether he knew "what decision [he] had to make next" for his defense. Defendant acknowledged that he had three options: 1) "to file the certificate for the [a]ppellate [c]ourt;" 2) "to file a motion for reconsider [*sic*] sentence;" and 3) pursue "a motion to file a motion to take back [his] guilty plea." The court asked whether defendant understood that those three options required "some technical skill about what to write in any of those motions or certificates." Defendant answered, "Yes. With the help of God, I believe I can accomplish it." The court responded, "All due respect to God, he may not have graduated law school, and [defense counsel] did. So[,] [defense counsel] has those skills and you do not." The court reiterated the technical skill necessary for defendant to represent himself, leading defendant to say:

> "Yes, ma'am. I'm—I'm—you know, I'm asking for help in certain ways, and [defense counsel] ain't agreeing with me. He's say [*sic*] it's irrelevant. What I'm telling him to put in motion [*sic*] for to reconsider [*sic*] sentence and for what happened in the past, I don't want to bring it up much. But that's—I feel with my heart that that's the best option if—unless if you have somebody in mind. I know—I don't want to take this case— take back my guilty plea and waste the taxpayers' money."

¶ 22    The court advised defendant that it would not be able to hear any irrelevant matters from his "writings or in [his] pleadings," and asked whether defendant understood. Defendant responded, "I'm kind of a little lost. I'm sorry." The court acknowledged that defendant had a lot of "things [he wanted] to say" in a prospective motion to withdraw or a motion to reconsider but stressed that anything he submitted to the court must be relevant to his defense. Eventually, defendant acknowledged he understood as much. The court asked defendant whether he understood that his lack of familiarity with applicable court rules and procedures may prejudice his defense. Defendant responded, "No. I don't understand that, because I can easily look it up in the law books." The court noted that it was not going to make any further inquiries on the subject and concluded that defendant did not have "the capacity" to make any "decision or waiver" concerning his counsel.

¶ 23    On September 30, 2019, defense counsel indicated that defendant wished to proceed with his motion to reconsider. Defendant interjected, telling the court that he would like to enter a *pro se* "motion to withdraw [his] guilty plea," which he had brought to court with him. The court reminded defendant that he was still represented by defense counsel, and that defendant should speak with him concerning the motion. The parties set another status date so that defense counsel could have time to confer with defendant.

¶ 24    On October 25, 2019, a new assistant public defender, Judy Kullenberg, filed a motion to withdraw plea on behalf of defendant. On November 18, 2019, Kullenberg filed a Rule 604(d) certificate, and the parties appeared for arguments as to defendant's motion, which incorporated defendant's prior *pro se* motion to withdraw his guilty plea, providing that defendant was "under the [i]nfluence of [p]sychotropic medication" during his plea hearing, and as a result of this, he was unable to "understand or comprehend the scope of what was taking place" when he entered

his guilty plea. Defendant further alleged being coerced into entering the plea deal by Dolak.

¶ 25    While Kullenberg conversed with the court, defendant interrupted her, presenting a *pro se* motion to "dismiss this cause on the grounds of not being able to uphold [defendant's] constitutional rights." The court denied the motion and continued with the hearing. Kullenberg called defendant to testify in support of his motion. As Kullenberg questioned him, he became argumentative at times, breaking off into tangents that invoked religious imagery and his "amendment right[s]" in a disordered, often incomprehensible manner. At a later point in his testimony, defendant acknowledged having been prescribed medication "for mental health," which he had been using during his plea hearing. Defendant confirmed that he was not currently "taking that medication."

¶ 26    Dolak testified on the State's behalf and rebutted many of the points made in defendant's motion. He further testified that he had defendant complete a "psychological exam" for "communication purposes," and while he had "questions about [defendant's] mental status," he did not have a "*bona fide* doubt of his fitness."

¶ 27    After the parties made their arguments, the court denied defendant's motion. In doing so, the court pointed out that the record rebutted defendant's assertions that his guilty plea was not knowing or voluntary. The court then asked the parties, "I think that we do have a motion to reconsider sentence still out there, is that correct?" Kullenberg advised the court that she had a copy of defendant's motion to reconsider, which Dolak had filed on April 20, 2018, and that she was prepared to adopt the motion for argument. The State also indicated that it was prepared to argue the motion.

¶ 28    While the parties and the court were discussing the latter motion, defendant continued to interrupt the proceedings, protesting the court's ruling as to his motion to withdraw his guilty plea,

as well as its denial of his earlier request to proceed *pro se*:

> "You said, you know, you're not smart enough to be your own attorney, and I said, no, [y]our Honor. I said, I can go to the law library, and you said, denied. What kind of type of ruling is that? That's a ruling—and it's documented, and if it's not, then this system is taking out of the transcripts."

Despite the court's warnings, defendant continued to interrupt the proceedings, until the circuit court ordered him to be removed from the courtroom. After the parties presented their arguments, the court denied defendant's latest motion to reconsider. Defendant timely appeals.

¶ 29                                    II. ANALYSIS

¶ 30    On appeal, defendant argues the circuit court abused its discretion in refusing to allow defendant to represent himself during postplea proceedings.  Defendant also argues that the trial court did not substaintially comply with Rule 402(a) when it did not admonish defendant before accepting his guilty plea. We consider each of these arguments in turn.

¶ 31                         A. Right to Self-Representation

¶ 32    First, we hold that the trial court did not abuse its discretion when it denied defendant's request to represent himself in the post-plea proceedings. In *Faretta v. California*, 422 U.S. 806, 821 (1975), the U.S. Supreme Court found that the sixth amendment right to counsel inversely provides litigants the right to represent themselves in criminal proceedings. However, in order to be valid, a defendant's waiver of counsel must be made voluntarily, knowingly, and understandingly. *People v. Redd*, 173 Ill. 2d 1, 21 (1996). "Before a criminal defendant's waiver of counsel will be deemed valid[,] the trial court must determine that defendant has the ability to understand the proceedings, that he knows the significance and consequences of his decision, and that his waiver was not coerced." *Id.* Several factors should be considered in determining the

validity of a waiver of counsel, such as a defendant's background, experience, and conduct." *Id.*

"[T]he Constitution permits States to insist upon representation for those competent enough to

stand trial ***[,] but who still suffer from severe mental illness to the point where they are not

competent to conduct trial proceedings by themselves." *Indiana v. Edwards,* 554 U.S. 164, 178

(2008). Also, "[a] defendant's lack of civility and decorum *** is a valid basis for denying his

request for self-representation." *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 74. The entire

record should be considered in determining whether a waiver was knowing and voluntary. *Redd*,

173 Ill. 2d at 21. We reverse a trial court's decision concerning a defendant's request to represent

him or herself only upon an abuse of discretion. *People v. Burton*, 184 Ill. 2d 1, 25 (1988).

¶ 33    For instance, in *Edwards*, the defendant was charged with attempted murder, battery with

a deadly weapon, criminal recklessness, and theft after shooting at a security guard during a failed

attempt to steal a pair of shoes from a department store. 554 U.S. at 167. After three competency

hearings, it was determined that the defendant suffered from schizophrenia and was unfit for trial.

*Id.* at 168. He was then committed to a state mental facility. *Id.* Months later, the facility reported

that the defendant had become fit to stand trial. *Id.* One year later, on the eve of trial, the defendant

requested to represent himself, but his request was seemingly denied by the trial court. *Id.* at 169.

He was ultimately convicted of criminal recklessness and theft. *Id.* The State sought to retry

defendant for the attempted murder and burglary charges, and the defendant again requested to

represent himself at this second trial, but his request was once again denied. *Id.* In denying his

request, the trial court noted the defendant's continued struggles with schizophrenia, and found

that, while defendant may have been competent to stand trial, he was not competent to defend

himself. *Id.* After the second trial, he was found guilty of attempted murder and burglary. *Id.*

¶ 34    The defendant appealed, and an Indiana appellate court reversed, finding that the defendant

was deprived of his constitutional right to self-representation. *Id.* The Supreme Court of Indiana affirmed the appellate court's decision. *Id.* However, the U.S. Supreme Court vacated the judgment of the Supreme Court of Indiana, concluding that the U.S. Constitution permitted states to limit a defendant's right of self-representation when that defendant "lacks the mental capacity to conduct his trial unless represented." *Id.* at 174. The U.S. Supreme Court further suggested that the trial court's denial of the defendant's attempts to proceed *pro se* did not constitute error, reasoning that "the trial judge, particularly one such as the trial judge in this case, who presided over one of [defendant's] competency hearings and his two trials, will often prove best able to make more fine-tuned capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177. Since *Edwards*, ensuing Illinois decisions have noted that "[s]ubsequent cases applying [the case] have found that a defendant was properly denied the right to proceed *pro se* where *** the defendant suffered from schizophrenia and refused to take his medication." *People v. Sheley*, 2012 IL App (3d) 090933 (2012), ¶ 24.[3]

¶ 35    Here, defendant argues that the circuit court abused its discretion by refusing defendant's clear and unequivocal request for self-representation. In support of this argument, defendant argues that the circuit court's decision was not based on defendant's lacking mental capacity, but instead, improperly stemmed from defendant's "lack of legal ability." Defendant further argues that, although "a state may insist upon representation by counsel for defendants competent to stand trial but suffering from 'severe mental illness,' " no doubt was ever raised below concerning defendant's competency or fitness to stand trial or plead guilty. Defendant points out that, "when

---

[3] Specifically, the *Sheley* court cited to a Texas decision, *Ji v. State*, 316 S. W. 3d 860 (Tex. Ct. App. 2010) in support of this proposition. *Sheley*, 2012 IL App (3d) 090933, ¶ 24.

[defendant's] fitness to stand trial or plead guilty was evaluated pursuant to a previous[, unrelated] case, he was deemed fit." Moreso, while defendant acknowledges that he does suffer from schizophrenia, he suggests that, pursuant to *Sheley* and *Rainey*, his illness was not severe enough to render him incapable of waiving counsel.

¶ 36    We find these arguments unpersuasive for several reasons. First, while defendant correctly points out that a defendant should not be denied the right of self-representation for his or her lack of legal expertise, the record sufficiently establishes that the trial court's denial was based on defendant's diminished capacity, and not his lack of legal acumen. *Edwards*, 554 U.S. at 172. On July 22, 2019, when defendant first requested to represent himself in the post-plea proceedings, the circuit court immediately asked defendant about his age, level of schooling, and current mental health diagnosis. We note that these topics all pertain to defendant's capacity, and not his legal experience. The court further asked defendant numerous questions concerning his mental illness and spent considerable time ascertaining whether defendant was currently taking medication for his schizophrenia. Again, these topics are directly relevant to defendant's mental capacity.

¶ 37    When denying defendant's request for self-representation, the circuit court explicitly stated that defendant lacked "the capacity" to make any "decision or waiver" of his defense counsel. As such, the circuit court's statement affirmatively rebuts defendant's arguments that its decision was improperly based on defendant's insufficient legal capabilities. Furthermore, the decision was not an abuse of discretion where the court was aware that defendant: 1) had a prolonged history of experiencing auditory hallucinations; 2) believed he could converse with God and listen to sounds emanating from Hell; 3) had scored below average in cognitive functioning; 4) was—like the defendant in *Edwards*—diagnosed with schizophrenia; 5) had stopped taking his antipsychotic medication despite the reported need for on-going treatment; 6) was previously diagnosed with

bipolar disorder; 7) responded to the court's relevant questions in a disjointed, borderline nonsensical manner; 8) could not remember whether he had a mental health diagnosis; and 9) acknowledged that he could not remember the circumstances surrounding his guilty plea.[4]

¶ 38    It is true that the circuit court did ask defendant some questions regarding the legal aspects of his case and advised defendant that self-representation necessarily involved "some technical skill," which defendant lacked. The court further asked defendant whether he understood that any arguments he made while defending himself would need to be relevant. However, in our view, this line of questioning does not indicate that the trial court's denial was based on defendant's lack of legal expertise. Instead, we understand these questions to be the trial court's attempt to ascertain whether defendant adequately understood the magnitude of the challenge self-representation would present, as well as a gentle attempt to dissuade defendant from undertaking what the trial manifestly believed to be an unwise decision.

¶ 39    Second, while defendant points out that his competence to stand trial or enter a guilty plea

---

[4] We note that the record shows that defendant had a history of interrupting various court proceedings, and, on November 18, 2019, defendant even had to be escorted out of the courtroom as a result of his disruptive behavior. Such behavior similarly indicates that the trial court correctly denied defendant's request for self-representation. *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991) ("a trial judge may terminate self-representation by a defendant who engages in serious and obstructionist misconduct"). While some of defendant's behavioral issues occurred after the circuit court denied his request to waive counsel and were therefore not considered by the court, we can affirm the court's decision for any basis appearing in the record. *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27.

had not previously been called into question, pursuant to *Edwards*, a defendant who has been found competent to stand trial may nonetheless lack the mental capacity to waive counsel. *Edwards,* 554 U.S. at 172. Additionally, the record indicates that, at the time defendant entered his guilty plea, he was still using antipsychotics to treat his schizophrenia. However, by the time he requested to represent himself in the post-plea proceedings, he had stopped taking his medication. For these reasons, defendant's competence leading up to the entry of his guilty plea could not serve as a baseline establishing his capacity, as it existed on July 22, 2019, when he requested to proceed *pro se.*

¶ 40    Finally, defendant's reliance on *Sheley* and *Rainey* to establish that the trial court abused its discretion in denying his request to represent himself in the postplea proceedings is misplaced. In *Sheley*, the defendant was charged with aggravated battery, aggravated assault, and criminal damage to property after allegedly dismantling a chair and throwing its legs at a group of correctional officers. 2012 IL App (3d) 090933, ¶ 2. After the defendant orally moved to represent himself, a neurologist was asked to examine the defendant in a different, pending case, and reported that the defendant was " 'consistently alert, responsive, and oriented to person, place, time, and reason for the evaluation.' " *Id.* ¶ 4. However, the neurologist also noted that the defendant had a history of poor anger management, an explosive personality, and had engaged in "crack cocaine binges" when he was not in jail. *Id.* The defendant also tested in the normal IQ range, had normal executive function, understood and was able to explain his pending charges, and displayed an understanding of general court procedures and trial proceedings. *Id.* ¶ 5. The neurologist ultimately diagnosed the defendant with "cognitive disorder not otherwise specified, cocaine and alcohol abuse, and personality disorder not otherwise specified." *Id.* ¶ 6. He also found the defendant to possess "the basic mental ability to render him fit to stand trial" and reported that

the defendant "had the capacity to knowingly and intelligently appreciate his right to counsel." *Id.* While the neurologist believed that defendant could organize and prepare for trial, he also believed that the defendant was incapable of " 'realistically appreciat[ing] the consequences and potential pitfalls of waiving his right to counsel,' " leading the neurologist to conclude that defendant lacked the capacity to represent himself effectively. *Id.*

¶ 41 After being admonished as to the ramifications of waiving his counsel and after being arraigned, the defendant stated that he decided to accept a public defender as his counsel. *Id.* ¶ 9. Months later, before discovery had been completed, the defendant once again moved for leave to represent himself. *Id.* ¶ 10. A psychiatrist's report was attached to the motion, noting that the defendant "demonstrated a thorough understanding of the charges against him[self]" and diagnosing the defendant with "cocaine-induced hallucinations, which were in remission, and 'probable' antisocial personality disorder." *Id.* ¶ 11. Still, the psychiatrist determined that defendant exhibited no paranoia and that he "was fit to waive counsel." *Id.* After evaluating both the neurologist's and psychiatrist's reports, the court denied defendant's motion, finding:

> " '[B]ecause of *** the ease with which an uninitiated, inexperienced individual who doesn't know the law[,] because of the ease with which experienced counsel could draw out damaging information and/or admissions from you that might not even be important for this trial in front of a jury but which might very well be lethal to you in your capital murder case, I'm denying your request to represent yourself here.' " *Id.* ¶ 14.

¶ 42 The appellate court reversed, explaining that "the record fail[ed] to show that [the] defendant suffered from a " 'severe mental illness' " that would affect his competency to conduct his own defense," as specifically reported by the psychiatrist. *Id.* ¶ 25. The court also reasoned that, while the neurologist had earlier opined that the defendant was incapable of self-

representation, "[h]e also refrained from diagnosing [the] defendant as suffering from a specific mental illness." *Id.* Furthermore, according to the appellate court, the defendant had demonstrated to both the neurologist and psychiatrist that he "understood the charges against him[self], that he was knowledgeable regarding courtroom proceedings, *** that he was coherent and capable of participating effectively in a conversation," and that—despite one isolated outburst he had previously made—his courtroom demeanor "also demonstrated his ability to represent himself." *Id.* ¶¶ 25-26.

¶ 43    While defendant argues that many of the factual circumstances in the instant matter mirror those in *Sheley*, we believe the case to be plainly distinguishable. First, unlike the defendant in *Sheley*, defendant had a longstanding diagnosis of schizophrenia, which, at the time defendant made his request, was untreated by medication. In fact, in his lengthy statement of allocution, defendant acknowledged his own struggles with his mental health issues and suggested that those issues may be hereditary, as defendant's father, uncle, and grandfather all purportedly had struggles with similar disabilities. While defendant argues that this mental illness was not severe enough "as to necessitate the continued appointment of [a] public defender," as we have stated earlier, defendant's various symptoms—as reported by the PSI—certainly evince the severity of defendant's schizophrenia. Indeed, cases applying *Edwards* have found that defendants suffering from untreated schizophrenia, such as defendant, were properly denied the right to self-representation. See *id.* ¶ 24. Some cases have even found that a schizophrenic defendant who *is* using medications may properly be denied the right to represent him or herself. See *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 48 (denial of defendant's request to proceed *pro se* was proper where "[t]he record show[ed] that[,] at the time [the] defendant made the request to represent himself, the trial court was aware there was an issue raised concerning [the] defendant's

mental capacity and statements that [the] defendant was schizophrenic and taking psychotropic medication").

¶ 44    Unlike in *Sheley*, here, no psychiatrists opined that defendant was competent to represent himself. Also, while the *Sheley* defendant seemingly was able to coherently conduct himself before the court, here, after defendant stopped using his medications, he displayed disjointed thinking, as evidenced by his various responses to the circuit court's questions, and defendant also had a history of interrupting court proceedings.

¶ 45    Finally, while the trial court in *Sheley* reasoned that the defendant's request to proceed *pro se* should be denied for an improper reason, being "the ease with which experienced counsel could draw out damaging information and/or admissions from [the] defendant," the circuit court here was explicit in explaining that defendant's request was denied for a legitimate reason—defendant's lack of capacity. For all of these reasons, we find *Sheley* to be distinguishable.

¶ 46    Likewise, defendant's reliance on *Rainey* is similarly unavailing. There, the appellate court found that the defendant's clear and unequivocal request to waive counsel was properly denied where defendant had a history of "seriously obstructionist" conduct before the court. *Rainey*, 2019 IL App (1st) 160187, ¶ 80. In reaching this conclusion, the appellate court found that, while the trial court there remarked that defendant was " 'not capable of representing himself,' " other contextualizing statements that the trial court made established that defendant's request was not improperly denied for his lack of legal ability, but because the trial court properly found that defendant was incapable of representing himself in a dignified manner. *Id.*

¶ 47    Here, defendant argues that, unlike the trial court in *Rainey*, the circuit court here did not make any contextualizing statements suggesting that defendant's request was denied for any legitimate reasons, such as a lack of capacity. For this reason, defendant suggests that the court's

denial could only have been a result of defendant's lack of legal abilities. Once more, we disagree.

¶ 48    Prior to discussing the legal aspects of defendant's case, the court engaged defendant in an extended colloquy regarding his age, education, and mental health history—all of these topics relate to defendant's mental capacity and refute defendant's suggestion that the court was only preoccupied with defendant's legal ability. Also, unlike the trial court in *Rainey*, the trial court here clearly explained that it was denying defendant's request because he lacked the capacity to waive counsel. Therefore, unlike *Rainey*, there was no need for any "contextualizing remarks" to clarify the circuit court's reasoning in denying defendant's request to proceed *pro se*. For all of these reasons, we find that the circuit court did not abuse its discretion in denying defendant's request.

¶ 49                              B. Rule 402 Admonitions

¶ 50    Next, defendant contends that the circuit court failed to sufficiently admonish defendant as required by Illinois Supreme Court Rule 402. Rule 402 pertains to the procedures involving plea discussions and agreements. Ill. S. Ct. R. 402 (eff. July 1, 2012). "Pursuant to Illinois Supreme Court Rule 402, every defendant who enters a plea of guilty has a due process right to be properly and fully admonished." *People v. Whitfield*, 217 Ill. 2d 177, 188 (2005). Prior to accepting a plea of guilty, Rule 402 requires a trial court to inform a defendant of the following:

> "(1) the nature of the charge; (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; (3) that the defendant has the right to plead not guilty, or to persist in that plea if it has already been made, or to plead guilty; and (4) that if he or she pleads guilty there will not be a trial of any kind, so that by pleading guilty he or she waives the right to a trial by jury and the right to be confronted with the witnesses

against him or her; or that by stipulating the evidence is sufficient to convict, he or she waives the right to a trial by jury and the right to be confronted with any witnesses against him or her who have not testified." Ill. S. Ct. R. 402(a).

According to Rule 402, "a court's failure to state the penalty to which the defendant may be subjected because of consecutive sentences renders a defendant's plea involuntary." *People v. McCracken*, 237 Ill. App. 3d 519, 521 (1992). A defendant is deprived of his due process rights when a court fails to "substantially comply" with these directives. *Whitfield*, 217 Ill. 2d at 195. We review a court's compliance with Rule 402(a) *de novo*. *People v. Johnson*, 2021 IL App (2d) 180775, ¶ 11.

¶ 51    Here, defendant argues that, before he entered his guilty plea, the circuit court failed to inform him of the maximum sentence prescribed by law in this case, as it failed to explain the possibility of discretionary consecutive sentences being imposed on counts V and VIII. Defendant argues that, consequently, because the circuit court did impose a discretionary consecutive sentence as to count V, the circuit court's defective admonitions rendered his plea unknowing and involuntary. In support of this argument, defendant points out that, despite the fact that he had been admonished "that he could receive an aggregate sentence ranging from probation to 17 years['] imprisonment," his actual "maximum exposure due to the possibility of discretionary and mandatory consecutive sentences was actually an aggregate prison term of 41 years." Defendant suggests that this large discrepancy between the circuit court's admonitions and the actual, applicable sentencing ranges further establish that defendant's plea cannot be considered to have been knowing or voluntary.

¶ 52    In response to these arguments, the State asserts that the circuit court substantially complied with Rule 402 by admonishing defendant of the applicability of any *mandatory*

consecutive sentences, and that it was not required to give similar admonitions "as to consecutive terms that *may* be imposed at the discretion of the court." The State further argues that, even if we were to find that the court erred in admonishing defendant as to his applicable sentencing range, we should not disturb the circuit court's sentence, as defendant has not shown any prejudice resulting from such an error.

¶ 53 As a preliminary matter, defendant admits that he did not properly preserve this argument. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Normally, a defendant's failure to raise an issue in a motion to withdraw a plea of guilty results in forfeiture. *McCracken*, 237 Ill. App. 3d at 520. Nevertheless, defendant asserts that the issue may be reviewed under plain error, or as a result of defense counsel's ineffective assistance. However, we need not consider whether either doctrine allows our review of the issue, because even if were to suppose that the issue had been preserved and the circuit court did err in admonishing defendant, defendant has not shown a denial of real justice or prejudice resulting from the admonitions.

¶ 54 A trial court's failure to properly admonish a defendant does not automatically warrant reversal or vacatur of a plea. *People v. Fuller*, 205 Ill. 2d 308, 323 (2002). In determining whether a court's failure to substantially comply with Rule 402's directives require reversal, we consider "whether real justice has been denied or whether the defendant has been prejudiced by the inadequate admonishment." *Id*. To show prejudice in this context, a defendant must demonstrate that, but-for the trial court's erroneous admonitions, he would not have pleaded guilty. *People v. Williams*, 2012 IL App (2d) 110559, ¶ 18.

¶ 55 For example, in *People v. Torres*, 228 Ill. 2d 382, 384 (2008), the defendant entered into a blind guilty plea to two counts of first-degree murder. Prior to accepting his plea, the trial court admonished the defendant that the sentencing range for the charges spanned between 20 and 60

years. *Id.* at 386. However, unbeknownst to the defendant at the time, the actual applicable statutory minimum was 45 years, as the result of a 25-year firearm enhancement. *Id.* at 398. The defendant was ultimately sentenced to 45 years' incarceration. *Id.* at 389. While appealing the dismissal of his postconviction petition, the defendant argued that he should have been allowed to vacate his plea as a result of the improper admonishment. *Id.* at 398. However, our supreme court disagreed, noting that the defendant was sentenced "exactly as he had been admonished," meaning he could not establish a deprivation of real justice or prejudice. *Id.* at 399-400.

¶ 56    In *People v. Baker*, 133 Ill. App. 3d 620, 621 (1985), the defendant pleaded guilty but mentally ill to charges of home invasion, indecent liberties with a child, and attempted deviate sexual assault. The parties did not agree upon a sentence that the defendant would receive as a result of his plea. *Id.* At the guilty-plea hearing, the court did not admonish the defendant that he was subject to consecutive sentencing. *Id.* at 622. However, the court did mention that the defendant could be sentenced to up to 30 years' incarceration. *Id.* The "[d]efendant was sentenced to six years' imprisonment for home invasion and four years' imprisonment for indecent liberties with a child and attempted deviate sexual assault; the latter two sentences [were] to be served concurrently, but consecutive to the sentence for home invasion." *Id.* at 621.

¶ 57    The defendant subsequently filed a motion to vacate his plea, arguing that the court failed to admonish him of the possibility of receiving consecutive sentences—a problem that was exacerbated when the defendant in fact received consecutive sentences. *Id.* The appellate court affirmed, noting that the defendant could not establish prejudice where "his actual aggregate sentence was much less than 30 years" and fell squarely within the trial court's admonitions. *Id.* at 622.

¶ 58    Here, defendant never alleged that he would not have pleaded guilty but-for the trial court's

improper admonitions.[5] Nonetheless, we find that the record rebuts such an inference. Prior to accepting defendant's plea, the circuit court advised defendant of the applicable sentencing ranges for each of the counts. The court described how a sentence resulting from count XI would be served consecutively with any other sentences from "any other count." As argued in his briefs, defendant understood these admonitions to mean that he was subject to "an aggregate sentence ranging from probation to 17 years['] imprisonment." Defendant was subsequently sentenced to an aggregate term of 13 years' imprisonment, which fell under this expected range. Therefore, like the defendants in *Torres* and *Baker*, defendant was sentenced "exactly as he had been admonished," meaning he cannot establish prejudice resulting from the court's admonitions. *Torres*, 228 Ill. 2d at 399-400. Otherwise put, defendant cannot establish prejudice where the imposition of his discretionary sentences resulted in a lessor, aggregate term than contemplated by the court's admonitions of the maximum applicable sentence.

¶ 59     Nonetheless, defendant argues that *McCracken*, 237 Ill. App. 3d 519, and *People v. Hayes*, 336 Ill. App. 3d 145 (2002) warrant a different result. We disagree.

¶ 60     In *McCracken*, the defendant pleaded guilty to driving under the influence of alcohol and

---

[5] Defendant acknowledges that he never made this argument, providing that "[h]e is not permitted to make new factual claims at this stage of litigation." We are unaware of any authority establishing that such an argument is a factual claim which defendant could not have made as part of his plain error or ineffective assistance claims. Nonetheless, if defendant is unable to point to any portions of the record to—at a minimum—create the inference that he would not have pleaded guilty but-for the trial court's improper admonitions, it seems unlikely that defendant was in fact prejudiced.

driving while his license was revoked. 237 Ill. App. 3d at 519. Prior to accepting the defendant's plea, the trial court told the defendant that he was subject to an extended-term sentence of up to six years if convicted, and that his sentences would run concurrently to each other, "unless someone told [him] ahead of time they were going to be otherwise." *Id.* at 520. The court, however, did not admonish the defendant about the possibility that his sentence would run consecutive to another, previously imposed sentence for a prior DUI. *Id.* Following a sentencing hearing, the trial court sentenced the defendant to an extended term of six years for the DUI charge, to run consecutive to his prior, unrelated sentence. *Id.* On appeal, the appellate court vacated the defendant's plea, finding that the trial court's admonitions led defendant to believe "that his sentences would not be consecutive." *Id.* at 521-22.

¶ 61    *McCracken* is distinguishable from the instant matter. There, the trial court's admonitions led the defendant to believe that, after pleading guilty to his charges, he would only remain incarcerated for up to six years. *Id.* at 520. Thus, after submitting his plea, the defendant was surprised to learn that he would instead be incarcerated for a total of nine years. *Id.* at 521. Because the defendant in *McCracken* effectively received a longer sentence than he had bargained for, the trial court's admonitions resulted in prejudice. *Id.* Here, on the other hand, defendant is unable to show prejudice, as he was sentenced in accordance with the circuit court's admonitions.

¶ 62    In *Hayes*, the defendant entered an open plea to possession of a controlled substance with intent to deliver within 1000 feet of a church. 336 Ill. App. 3d at 146. During the plea hearing, the trial court admonished defendant that, based on his background, he was subject to mandatory Class X sentencing, which entailed a sentence ranging from 6 to 30 years' incarceration, to be followed by 3 years of mandatory supervised release. *Id.* at 150. However, like the trial court in *McCracken*, the trial court in *Hayes* did not admonish the defendant that his sentence could possibly run

consecutively to another seven-year prison term that he had received in a previous, unrelated case. *Id.* Defendant was ultimately sentenced to six years' incarceration for the possession offense, to be served consecutive to his prior, unrelated sentence. *Id.* On appeal, the appellate court noted that the failure to admonish a defendant properly does not automatically call for the vacatur of a guilty plea unless the faulty admonitions resulted in a deprivation of real justice or prejudice. *Id.* at 151. Nonetheless, without specifically explaining how the defendant was prejudiced, the appellate court vacated his guilty plea, finding that the improper admonitions rendered his plea involuntary. *Id.* at 152-53.

¶ 63     Here, defendant argues that, pursuant to *Hayes*, "the simple fact that the trial [court] failed to admonish the [defendant] that [he] could be subjected to consecutive sentences was dispositive." As such, defendant essentially argues that, because the trial court erred in admonishing defendant as to the possibility of consecutive sentences, and because he did in fact receive consecutive sentences, he does not need to otherwise show prejudice in order to be entitled to vacate his plea. Such an argument explicitly contradicts several decisions from our supreme court. *People v. Davis*, 145 Ill. 2d 240, 250 (1991) ("[w]hether reversal is required depends on whether real justice has been denied or whether defendant has been prejudiced by the inadequate admonishment"); *Torres*, 228 Ill. 2d at 399 (no basis to vacate guilty plea where the defendant's sentence comported with the trial court's improper admonitions, resulting in a lack of prejudice). Consequently, because defendant has failed to show any prejudice resulting from the circuit court's admonitions, we decline his request to vacate his plea, or, in the alternative, to modify his sentence.

¶ 64                                    III. CONCLUSION

¶ 65     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 66     Affirmed.